BLOCK, TRADING UNDER THE NAME OF WHITES, *v.* HIRSH.

ERROR TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 640. Argued March 3, 1921.—Decided April 18, 1921.

The Act of October 22, 1919, c. 80, Title II, 41 Stat. 297, created a commission with power, upon notice and hearing, to determine whether the rent, service and other terms and conditions of the use and occupancy of apartments, hotels and other rental property in the District of Columbia, were fair and reasonable and, if found otherwise, to fix fair and reasonable rents, etc., in lieu; it provided that a tenant's right of occupancy should, at his option, continue, notwithstanding the expiration of his term, subject to regulation by the commission, so long as he paid the rent and performed the conditions fixed by his lease or as modified by the commission; reserved, however, to the owner his right to possession for actual *bona fide* occupancy by himself, his wife, children or dependents, upon giving

a 30 days' notice to quit; made the commission's findings conclusive on matters of fact, but reviewable by the Court of Appeals of the District on matters of law; limited the regulation thus established to a period of two years; and declared that its provisions were made necessary by emergencies growing out of the War, resulting in rental conditions dangerous to the public health and burdensome to public officers, employees and accessories, and thereby embarrassing the Federal Government in the transaction of the public business.— In an action in which an owner, ignoring this legislation, and without serving the required notice, sought to oust a tenant, holding over in violation of a lease made before the act was passed, and in which the act was relied on by the tenant, particularly its requirement of notice, but was declared unconstitutional by the court below,—

*Held:* (1) That the legislative declaration of facts affording the ground for the regulation was entitled to great respect and was confirmed by common knowledge. P. 154.

(2) That the exigency existing in the District clothed the letting of buildings there with a public interest so great as to justify regulation by law, *i. e.*, by the police power of Congress,—while such exigency lasts. P. 155.

(3) That, assuming the owner in this case did not desire the premises for his own use (as it might have turned out if the entire law had not been declared void) and treating the property as held for rent, the effect of the act, in allowing the tenant to retain possession at the rent stipulated in the expired lease or as it might be modified by the commission, was not, under the circumstances, an unconstitutional restriction of the owner's dominion and right of contract or a taking of his property for a use not public. P. 156.

(4) That such regulation was justified as a temporary measure, even though it might not be as a permanent change. P. 157.

(5) That it did not become otherwise if the "reasonable rent" it secured meant depriving the owner, in part at least, of the power of profiting by the sudden influx of people to Washington, caused by the needs of the Government and the War. P. 157.

(6) That the preference given to the tenant in possession was justified as an incident of the policy of the legislation. P. 157.

(7) That, the end being legitimate and the means reasonably related to it, the wisdom of the means was not for the courts to pass upon. P. 158.

(8) That the court was not prepared to say in this case that the law, being valid in its principal aspects, was invalid in so far as it might operate to deprive landlords and tenants of trial by jury on the right to possession. P. 158.

50 App. D. C. 56, 73; 267 Fed. Rep. 614, 631, reversed.

ERROR to review a judgment of the court below holding unconstitutional the act regulating rents, etc., in the District of Columbia, in proceedings by a landlord to oust a tenant holding over. The facts are stated in the opinion, *post*, 153.

*Mr. Jesse C. Adkins*, with whom *Mr. Julius I. Peyser*, *Mr. George E. Edelin* and *Mr. Theodore D. Peyser* were on the brief, for plaintiff in error:

I. The requirement of thirty days' notice is constitutional. It but restores the law as it existed in the District prior to 1864 and is a mere change in the remedy. *Antoni* v. *Greenhow*, 107 U. S. 769.

Defendant in error cannot question the constitutionality of the regulatory provisions of the act. He is not within the class affected by them because he failed to give the required notice. *Turpin* v. *Lemon*, 187 U. S. 51; *Collins* v. *Texas*, 223 U. S. 288. Giving such a notice would not estop him to attack the statute. He invoked relief under the District Code, not the Rents Act. If the tenant questioned his good faith, the tenant would proceed before the Rent Commission. Mere defense to that complaint would not estop an attack on the constitutionality of the statute.

II. The regulatory provisions of the Rents Act are constitutional under the war power. That power includes the remedying of evils which have arisen from war. *Stewart* v. *Kahn*, 11 Wall. 493, 507. War existed when the act was approved. *Ruppert* v. *Caffey*, 251 U. S. 264. The shortage of houses in the District ensued from the rise and progress of the war. Section 122 of the act so declares, and this declaration is supported by the facts.

The Draft Law, appropriating the liberty and lives of citizens, was sustained in *Selective Draft Law Cases*, 245 U. S. 366. This man-power was made effective by a mass of legislation, some taking private property and some

regulating its use. The railroads were taken. The Lever Act of August 10, 1917, provided for the control of necessities of life. Under it fuel and articles of food were regulated in the minutest degree. Prices were fixed under this statute as well as under other legislation.

III. During the emergency caused by the war Congress in the exercise of its plenary police power in the District of Columbia may regulate rents of real property devoted to rental purposes.

The court below held that the owner of a reversion in real property which was under rental for a fixed term had the absolute right to oust the tenant instantly at the expiration of the term and to immediately regain possession, and that no economic or other condition could justify modification of these rights. But an owner never had an absolute right to use his property as he pleased. His rights over real property are not absolute. Unimproved real estate is regulated. The owner may be compelled to abate a nuisance; to erect fences, *Atlantic Coast Line R. R. Co. v. Goldsboro,* 232 U. S. 548, 561; to abstain from building without a permit. Every regulation deemed essential for health and safety has been sustained. Sometimes the use of the land is impeded, sometimes part of the land is taken, sometimes the value of the property is greatly lessened.

Control over personal property is not absolute. Interest and the price of bread have always been regulated. Personal property devoted to unlawful uses may be confiscated. *Goldsmith-Grant Co. v. United States,* 254 U. S. 505.

An owner's right to transfer property is limited. The wife has always been protected. Certain formalities always attended the transfer of property. Familiar instances are statutes requiring conditional sales to be in writing and recorded; bulk sales acts, *Lemieux v. Young,* 211 U. S. 489; blue-sky laws, *Hall v. Geiger-Jones Co.,* 242 U. S. 539. In Nebraska a mortgagor of personal property cannot sell without the written consent of the mort-

gagee. *State* v. *Heldenbrand,* 62 Nebraska, 136. The consent of the selling agent of a pool must be obtained before tobacco may be bought from the grower who pooled it. *Commonwealth* v. *Hodges,* 137 Kentucky, 233. Grain sales must be made on the basis of actual weight. *House* v. *Mayes,* 227 Missouri, 641. Lard must be in containers of specified weight. *Armour & Co.* v. *North Dakota,* 240 U. S. 510.

If during the emergency the business of renting real property in the District of Columbia holds such a peculiar relation to the public interest as to justify it, there will be superinduced upon that business the right of public regulation. This is the underlying principle. *German Alliance Insurance Co.* v. *Lewis,* 233 U. S. 389; *Munn* v. *Illinois,* 94 U. S. 113; *Budd* v. *New York,* 143 U. S. 517; *Brass* v. *Stoeser,* 153 U. S. 391, 410.

State legislatures have applied it to economic conditions affecting their own people and industries. *Nash* v. *Page,* 80 Kentucky, 547; *Commonwealth* v. *Hodges,* 137 Kentucky, 244; *Douglas Park Jockey Club* v. *Talbott,* 173 Kentucky, 685; *Davis* v. *State,* 68 Alabama, 63; *State* v. *Mullins,* 87 S. Car. 510. Indiana regulates the taking of natural gas. *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190. Wyoming forbids the consumption of natural gas without the heat therein contained being utilized. *Walls* v. *Midland Carbon Co.,* 254 U. S. 300. New York has endeavored to protect its mineral springs. *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61. Idaho forbids the grazing of sheep on public lands within two miles of another's lands. *Bacon* v. *Walker,* 204 U. S. 311. In Florida and Washington a special license tax is imposed on merchants using trading stamps. *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342; *Tanner* v. *Little,* 240 U. S. 369. In many States the common-law rules of liability are abolished and the rights and duties of employer and employee are regulated. In Maine municipalities are authorized to estab-

lish yards for the sale of fuel at cost. *Jones* v. *Portland,* 245 U. S. 217. North Dakota has authorized the lending of money to citizens for the construction of homes. *Green* v. *Frazier,* 253 U. S. 233. In other States an ulterior public advantage has justified a comparatively insignificant taking of private property for what in its immediate purpose is private use. *Clark* v. *Nash,* 198 U. S. 361; *Strickley* v. *Highland Boy Gold Mining Co.,* 200 U. S. 527; *Offield* v. *N. Y., N. H. & H. R. R. Co.,* 203 U. S. 372; *Noble State Bank* v. *Haskell,* 219 U. S. 104; *Perley* v. *North Carolina,* 249 U. S. 510. Indiana has created a coal commission with power to regulate prices. *American Coal Mining Co.* v. *Special Coal & Food Commission,* 268 Fed. Rep. 563. In Oklahoma laundry prices are regulated. *Oklahoma Operating Co.* v. *Love,* 252 U. S. 331.

The business of renting property in the District has risen to such public importance that it may be regulated.

The legislative declaration in Section 122 of the act is controlling if a state of facts could exist which would justify it. *Munn* v. *Illinois, supra.*

A state of facts does exist justifying the legislation. The virtual monopoly of rental property causes great economic disparity between house-owners and their tenants; there is serious danger of oppression and extortion; the remedy of competition cannot be made effective for years; lack of regulation will result in serious injury to the health, safety, morals, order and welfare of the community.

The legislative determination is supported by a mass of public opinion. The shortage of housing is world-wide. New South Wales created a fair rents court. England, France, Spain, Germany, Wisconsin, New York, Maine, Massachusetts and New Jersey have sought relief through statutes.

*Mr. Wm. G. Johnson,* with whom *Mr. Myer Cohen* and *Mr. Richard D. Daniels* were on the brief, for defendant in error:

The legislation is plainly unconstitutional and void, because its effect is to deprive the defendant in error of his property without due process of law, to take his property for private use and bestow it upon another, without compensation, and, in an action at law, in which the value in controversy exceeds twenty dollars, to deny to him, and to deprive him of, the right of trial by jury.

It is indisputable that, at the time of making the lease to Block and of his entry into possession thereunder, the owners had a vested estate, a reversion in fee, to come into possession, absolutely, on January 1, 1920; Block was a tenant in possession whose right of possession absolutely terminated on December 31, 1919, and by his covenant in the lease he had specifically agreed to surrender possession on that date. Also, that there existed legal remedies for enforcing this right of possession, should the tenant violate the agreement in his lease, and fail to surrender possession at the expiration of the term demised.

The owners also had an unrestricted right of alienation of the property, in the open market, to any purchaser whomsoever, and such alienation would confer upon their alienee all their rights of possession, subject to no lien, claim or charge of any kind, in behalf of the tenant, beyond the rights conferred by the lease itself.

They and their grantee would also have the right, either during or at the end of the term, to let the property anew, by successive lease, to begin at the expiration of the term demised, to another tenant, at the same or a higher or lower rent, or upon any other consideration, and the lessors and their grantee might, if they so preferred, occupy the property themselves or allow it to remain vacant; all without let or hindrance from the tenant.

The lease to Block, as appears on its face, preserved to the lessors and their grantee all of these rights to their utmost extent.

But he now claims that these rights of the lessors, and of their grantee, under the lease by which he obtained that possession, have all been swept away; not by any contract or agreement of the parties, but by subsequent legislation of Congress. And further, that by that legislation there has been conferred upon him the right and power, at his option, to retain possession of said property, in violation of his covenant in the lease, and after the expiration of the term demised.

The requirement for notice to the tenant embodied in the act is neither an applicable nor valid provision of law. The act was not operative when Hirsh's right of possession and right of action accrued. Any notice under the act would have extended Block's right of possession beyond the term of the lease. The notice required was a direct limitation upon Hirsh's right of possession under the lease, and required Hirsh to surrender in advance his constitutional right to a trial by jury.

Giving the notice would have precluded Hirsh from questioning the constitutionality of the statute. The statute undertook to take from Hirsh his right of possession of his property and transfer it to Block to hold at Block's option. The same statute gave Hirsh a means of escape from this spoliation for Block's benefit in two cases; if he wished the property for his own occupancy, or wished to tear down the building and immediately rebuild for rental purposes. But the escape from this spoliation was conditioned, in the same section of the same act. The conditions were, first, that he give Block a thirty days' notice, containing a full and correct statement of the facts and circumstances upon which it was based; second, that Block might dispute that notice as to its accuracy, sufficiency, good faith and service; and, third, that the commission should finally determine that dispute, without a jury trial and its decision on the facts should be final, and binding upon every court.

Hirsh had another mode of escaping this spoliation, in Block's behalf, and that was by appealing to the courts for protection under the Constitution.

He had perfect freedom to pursue either course but could not pursue both. If he elected to avail himself of the mode of escape given by the statute and gave the notice, he was then bound by his choice and could not question the constitutionality of the statute. Such is the settled law of this court. *Daniels* v. *Tearney*, 102 U. S. 415, 421; *Electric Co.* v. *Dow*, 166 U. S. 489, 490; *Wight* v. *Davidson*, 181 U. S. 371, 377; *Grand Rapids & Indiana Ry. Co.* v. *Osborn*, 193 U. S. 17, 29; *Shepard* v. *Barron*, 194 U. S. 553, 567.

The legislation of Congress relied upon by plaintiff in error is unconstitutional and void. Language and purpose are alike plain. It enacts that notwithstanding the fact that Block's lease expires, absolutely, on the 31st of December, 1919, and that the unconditional right to immediate possession, on that day, accrued to the lessors and to their assignee, nevertheless, Block, if he so please, may retain possession for two years longer and the rightful owner shall not maintain any proceeding to recover possession.

Another provision,—that "every purchaser shall take conveyance of any rental property, hotel, or apartment subject to the rights of tenants as provided in this title,"— subjects the fee simple owner's title to a lien in favor of the tenant and cuts down the owner's power of alienation by requiring that all purchasers shall take subject to that lien. This restraint upon the power of alienation is heightened by the fact that the lien is for no definite time, but at the caprice of the tenant.

Without any new contract between the parties, without the owner's consent, without any act done by either, without any consideration or compensation to the fee simple owner, and without a hearing or notice of any

kind, but solely by legislative declaration, this reversion of the owner is taken from him and given to the tenant and the owner's power of sale is made subject to this lien for an extension of lease at the will of the tenant.

By another provision the tenant may, however, with the consent of the commission, assign or sublet this reversion of the owner, at a profit to the tenant.

Nor is this all. By the terms of the "Saulsbury Resolution" (40 Stat. 593) the rent to be paid for this statutory appropriation of the owner's reversion to the use of the tenant is fixed by the legislature at the rate of rent fixed by the lease, no matter how much the rental value may have increased.

A yet further invasion of the owner's rights is provided by § 106 of the act. Under that provision, a tenant may call upon the commission to reduce the rent, and the commission may make that reduction and under § 107 require the owner to refund rent paid under the lease.

It is earnestly insisted that these invasions of private property rights are all unconstitutional and void, because they take private property for private use, they take private property without compensation and they deprive the owner of his property without due process of law. *Missouri Pacific Ry. Co.* v. *Nebraska,* 164 U. S. 403, 412, 413, 417; *Calder* v. *Bull,* 3 Dall. 386, 388, 389; *Wilkinson* v. *Leland,* 2 Pet. 627, 657, 658; *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 324, 325; *Ochoa* v. *Hernandez,* 230 U. S. 139, 161; *Sinking-Fund Cases,* 99 U. S. 700, 718, 719.

There is no power in the United States, through Congress or otherwise, to take private property for private use. The right to take it at all, is not expressly conferred by the Constitution, but, as held in *Kohl* v. *United States,* 91 U. S. 367, 374, 375, the right of eminent domain, to which all lawful taking is referred, is a necessary attribute of sovereignty, but limited to it for sovereign purposes.

Not only does this legislation attempt to take from the landlord owner his reversion and bestow it upon the tenant, to hold at the tenant's will, but it also denies all right of judicial redress. It does not change or substitute remedies, but denies them *in toto.* By the express terms of the act, the tenant's "right" to "use or occupancy" shall "continue" "and such tenant shall not be evicted or dispossessed so long as he pays the rent:"

But the previously existing right of action in the landlord to recover his property against wrongful detention is also "property" of which he may not be deprived without due process of law. *Pritchard* v. *Norton,* 106 U. S. 124, 132; *Munn* v. *Illinois,* 94 U. S. 113, 134.

It is also the constitutional right of the citizen to decide for himself with whom he will contract and whom he will accept or continue as tenant, and he may not lawfully be compelled to accept one as tenant of whom he does not approve. *Adair* v. *United States,* 208 U. S. 161, 173; *Coppage* v. *Kansas,* 236 U. S. 1.

The existence of a state of war gives no validity to the statute. War carries many and grievous afflictions, but among them is not the abrogation, temporary or permanent, of the constitutional limitations upon the power of Congress. Not one of the powers conferred, or restrictions imposed, upon Congress, by the Constitution, is accompanied with or qualified by any exception in the case of the existence of a state of war, unless it be the Third Amendment, which provides that—"No soldier shall, in time of peace be quartered in any house, without the consent of the owner, nor in time of war but in a manner to be prescribed by law." In this Amendment there is a plainly implied power in Congress to legislate as to the manner of quartering soldiers in a private house in time of war, but with this exception there is no restriction upon the power of Congress not equally applicable in both peace and war.

And it is not going too far to say that there is also a plain implication in this Amendment that no civilian shall be quartered in any house in time of either peace or war, without the consent of the owner. *Hamilton* v. *Kentucky Distilleries Co.*, 251 U. S. 146, 156; *Mitchell* v. *Harmony*, 13 How. 115, 134, 135.

There is nothing in the record to suggest that Block's retention of possession against the right of the owner could in any way aid or influence the prosecution of the war.

The legislative declaration that this property is affected with a public interest is, itself, invalid.

The facts, undisputed on the record, show that neither Hirsh nor his grantors did any act admitting or inviting the public to the possession or use of this property—on the contrary they did all that it was legally possible for them to do to exclude the public. The record also shows that the public has acquiesced in that exclusion, for it left Block in undisturbed possession throughout the term demised.

In *Munn* v. *Illinois, supra,* this court did not base its decision that the grain elevators were clothed with a public interest on any statutory declaration to that effect, but upon the facts admitted by the plaintiff in error. It then became necessary to determine whether, in the exercise of the police power to regulate the use of such property, the legislature had exceeded its powers. It was with reference to the facts calling for the exercise of the particular kind of regulation which the statute provided that the court uses the language quoted in the dissenting opinion of the court below, and not upon the question of fact whether the property was or was not affected with a public interest. *Producers Transportation Co.* v. *Railroad Commission,* 251 U. S. 228, 230.

Even if the mere legislative declaration that private property "is affected with a public interest" could be

evidence of that fact, it could not be conclusive; otherwise the use of those six words in a statute could destroy all private ownership in the whole country. The record in this case conclusively shows that Hirsh's property was not affected with a public interest; that it has not been subjected to a public use but that it has been, ever since the execution of the lease, private property in the strictest sense. *Weems Steamboat Co.* v. *People's Steamboat Co.*, 214 U. S. 345, 356; *Terminal Taxicab Co.* v. *District of Columbia*, 241 U. S. 252, 256.

It was contended in the court below that the universally admitted right of the legislature to regulate the rate of interest on loans of money was a recognition of the power to regulate purely private contracts between individuals. It may be said in this connection that interest statutes do not assume to compel the lending of money to particular persons nor the continuation of loans after they are due, on the condition that the interest be paid, as this legislation attempts to continue leases after their expiration.

But interest is a creature of statute and may be regulated or abolished by that power which gave it legal existence. Lord Bacon, Essay on Usury; *Lloyd* v. *Scott*, 4 Pet. 205, 224. There is, therefore, no analogy between the case of a statute fixing rates of interest and one transferring the landlord's reversion to his tenant, without the consent of the landlord.

*Mr. Henry H. Glassie*, Special Assistant to the Attorney General, with whom *The Solicitor General* was on the brief, for the United States as *amicus curiæ*, by special leave of court:

I. A declaration by Congress that emergencies growing out of the war caused apartments, hotels, and other rental property at the seat of government to be affected with a public interest is conclusive, unless the inference be

such as no rational mind could draw.  *Price* v. *Illinois*, 238 U. S. 446, 451; *Rast* v. *Van Deman & Lewis Co.*, 240 U. S. 342, 365.

II. The conclusion that, under the facts found, the relation between the owners and the users of such property could not be safely left to the unregulated action of individual economic interest, so far from being irrational, was a sound legislative judgment reached after an elaborate investigation into prices, rents and related subjects. Sen. Rep. 150, 66th Cong., 1st sess.; Sen. Rep. 327, 66th Cong., 2d sess.; House Rep. 349, 66th Cong., 2d sess.; House Rep. 269, 62d Cong., 2d sess. It is shared by other responsible legislatures forced to deal with similar conditions in areas of congested population. N. Y. Laws 1920, c. 136–145; c. 942–953; Wisconsin Laws Special Session 1920, c. 16; New Jersey Laws 1920, c. 193, c. 357; Massachusetts Acts of 1920, c. 555.

III. The whole argument against the statute proceeds upon an extreme individualistic conception of real property which, in effect, denies the existence of any police power in respect thereof. It is said that when a tenant's estate ceases by expiration of the term, the landlord's right to repossess the property is in its nature absolute, that he has an immediate right to let the property anew to another tenant at a higher rent, or not to lease it, and that his vendee has the same unqualified right. This is but a statement of the existing incidents of a reversion after a term of years in the absence of regulation. To say that an owner of a building not used by himself has, under whatsoever economic and social stress, an indestructible right to grant such use only upon such terms, for such price, during such time, and to such person as he may choose, immune from the possibility of any regulating control whatever, is but to assert, contrary to fundamental conceptions of the common law, that private ownership in land is absolute. This conception would

exclude the very things to which the term "affected with a public interest" was first applied, and cannot be reconciled with the long list of acts collected in *Head* v. *Amoskeag Manufacturing Co.*, 113 U. S. 9, 17–18. It is immaterial whether such statutes are deemed to rest on the right of eminent domain (113 U. S. 19), or upon the power to regulate use even to the extent of coercing it upon fair compensation where the public interest so requires. 113 U. S. 24–26; *Murdock* v. *Stickney*, 8 Cush. 113, 116. They all embody the principle of the subordination of ownership to utilization, where use by others is essential to the maintenance of general living conditions or increases the productive power or economic welfare of any considerable part of the population. Thus it has come to be established that real property may, under special circumstances of grave general concern, become so far affected with a public interest that uses which, in their immediate purpose, are private must be regarded as public. *Clark* v. *Nash*, 198 U. S. 361; *Strickley* v. *Highland Boy Gold Mining Co.*, 200 U. S. 527. These are cases of expropriation. But a like power to regulate must equally exist where the use of certain classes of property is so bound up with the characteristic life of the community and the operations of government that both will suffer utter disorganization unless fair and stable conditions are maintained in respect of the terms of such use.

IV. The public interest may be protected by regulating, on the basis of a reasonable charge, the compensation or rental to be paid for use of property by persons let into possession by the owners. *Munn* v. *Illinois*, 94 U. S. 113; *Budd* v. *New York*, 143 U. S. 517; *Noble State Bank* v. *Haskell*, 219 U. S. 104; *German Alliance Insurance Co.* v. *Lewis*, 233 U. S. 389.

The owner has devoted his property to a public use in that he has engaged in a business relation which the legislature has reasonably held to need regulation. It may

therefore be regulated after it has been entered into.
*Louisville & Nashville R. R. Co.* v. *Mottley,* 219 U. S. 467,
482, 485. Nor is "public use" limited to a community use
enjoyed by the public generally or one which the public
has a right to demand. *German Alliance Insurance Co.* v.
*Lewis, supra.*

The business of renting out apartments and houses
under the existing circumstances discloses the same
fundamental elements found in other cases where a public
interest has been held to warrant the regulation of a busi-
ness not enjoying any statutory privilege. There is in
such cases a state of virtual monopoly, or, conversely
stated, an absence of effective competition. The consum-
ing public stands in a position of economic helplessness.
This may result from conditions on the side of supply or on
the side of demand, from limitations natural in the
physical sense, *Spring Valley Water Works* v. *Schottler,* 110
U. S. 347; *Van Dyke* v. *Geary,* 244 U. S. 39, 47; or, natural
only in the sense that, under the circumstances of a given
community, facilities available for the particular purpose
are not susceptible of multiplication or enlargement.
*Munn* v. *Illinois,* 94 U. S. 113; *Budd* v. *New York,* 143
U. S. 517, 531, 535; *Brass* v. *Stoeser,* 153 U. S. 391, 402.

The public interest arising from the existence of an
instant need naturally receives a vast extension in all
periods of abnormal economic stress. *Wilson* v. *New,* 243
U. S. 332, 348. But to concede that rent regulation might
exist as a war power is to concede that it exists under cer-
tain conditions of social fact, whether arising from that
emergency or some other.

The recognition of such conditions of economic de-
pendence lies at the root of practically all the social legis-
lation of our time. *Knoxville Iron Co.* v. *Harbison,* 183
U. S. 13, 20; *Muller* v. *Oregon,* 208 U. S. 412, 422; *Erie
R. R. Co.* v. *New York,* 233 U. S. 671, 704; *German
Alliance Insurance Co.* v. *Lewis,* 233 U. S. 389, 417.

V. The housing situation in a city like New York or Washington presents all the features of a practical monopoly; the normal competitive system has completely broken down.

VI. The conditions are intensified by the special relations in which the District of Columbia stands to the Federal Government.

VII. Temporary continuance of occupancy is an appropriate means of making rent regulation effective.

(a) With respect to leases subsequent to the act, such authority seems clear since the contract clause has no application. *Munday* v. *Wisconsin Trust Co.*, 252 U. S. 499, 503; and Congress, having power to mould the landlord and tenant relation, may make it a statutory term in every tenancy that a tenant may continue to occupy the property for a limited time, upon payment of the stipulated rent or a fair rent fixed by authority. Pollock & M., Hist. Eng. L., vol. I, p. 338; vol. II, 106, 109; Holdsworth, Hist. Eng. L., vol. III, pp. 107, 180; *Mountain Timber Co.* v. *Washington*, 243 U. S. 219, 238; *New York Central R. R. Co.* v. *White*, 243 U. S. 188, 196, 200. Cf. The Maryland Acts for the redemption of ground rents. Md. Code, art. 53, §§ 24–25; Md. Acts 1884, c. 485; 1888, c. 395; 1900, c. 207; *Stewart* v. *Gorter*, 70 Maryland, 242; *Swan* v. *Kemp*, 97 Maryland, 686. The only limitation is that the essential property itself shall not be taken away, and that is not done when the owner throughout the emergency period gets the fair and reasonable value of the use.

(b) In respect of leases made before but expiring after the act, the power to extend the occupancy is a reasonable corollary of the power to regulate the rental. *United States* v. *Ferger*, 250 U. S. 199, 203, 205; *Jacobson* v. *Massachusetts*, 197 U. S. 11; *Miller* v. *Wilson*, 236 U. S. 373, 380.

(c) The owner's right to use the property is secured by the statute. The occupancy provision, therefore,

operates only to limit his future liberty to contract; that is, his liberty "to choose his own tenant." The impairment of any express covenant to surrender is merely incidental. What the statute regulates is the present rent for occupation subsequent to the act. If the landlord does not wish that there should be any subsequent occupation he has his old remedies. But if he wishes not to use but to rent, then the whole matter resolves itself into a question of the fair incidents of the regulation of the rent. *Manigault* v. *Springs,* 199 U. S. 473, 480; *Mutual Loan Co.* v. *Martell,* 222 U. S. 225, 231; *Knoxville Iron Co.* v. *Harbison,* 183 U. S. 13; *Keokee Coke Co.* v. *Taylor,* 234 U. S. 224; *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342; *Thornton* v. *Duffy,* 254 U. S. 361.

(d) The landlord's ordinary power to contract is not interfered with in favor of persons not already in privity with him, but in respect of a class recognized as having a natural equity beyond the technical termination of the term. This interest has been often recognized by courts as well as legislatures, especially when supported by local usage or when special economic circumstances give it peculiar significance. *Boyle* v. *Lysaght,* 1 Vernon & Scriven (Ir.) Rep. 135, 142, 144; *Banks* v. *Haskie,* 45 Maryland, 207, 220. Cf. *Murray* v. *Bateman,* Ridgway's Cas. Parl. 187, 19 & 20 Geo. III, c. 30. Landlord and Tenant (Ireland) Act 1870 (33 & 34 Vict. c. 46); Land Law (Ireland) Act 1881 (44 & 45 Vict. c. 49); Small Landholders (Scotland) Act 1911 (1 & 2 Geo. V., c. 49). See also 5 & 6 Geo. V. c. 97; 9 Geo. V, c. 7; 9 & 10 Geo. V. c. 90; 10 & 11 Geo. V. c. 17; *Nevile* v. *Hardy,* 37 Times Law Rep. 129.

(e) The landlord is not prevented from going out of the renting business or required to continue it upon the terms fixed by the act. He may stop renting. But, in an emergency such as that declared by Congress, the right to regulate rents effectively can not be thwarted

upon a ground so abstract and socially injurious as a theoretical right to evict tenants for the purpose of destroying the building or keeping it vacant.

VIII. The statute makes due provision for the recovery of possession upon evidence of withdrawal from the rental class. Clearly the legislature may require a notice of the fact of withdrawal, may prescribe a reasonable time for the purpose, and may further require the notice to be submitted in the first place for the determination of the commission, because, if valid, it marks the end of their authority. That the commission has no jury is of no consequence. There is no jury in the court in which the issue of possession is first tried. That the parties have one on appeal is sufficient. *Capital Traction Co.* v. *Hof,* 174 U. S. 145.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a proceeding brought by the defendant in error, Hirsh, to recover possession of the cellar and first floor of a building on F Street in Washington which the plaintiff in error, Block, holds over after the expiration of a lease to him. Hirsh bought the building while the lease was running, and on December 15, 1919, notified Block that he should require possession on December 31, when the lease expired. Block declined to surrender the premises, relying upon the Act of October 22, 1919, c. 80, Title II—"District of Columbia Rents"; especially § 109, 41 Stat. 297, 298, 301. That is also the ground of his defence in this Court, and the question is whether the statute is constitutional, or, as held by the Court of Appeals, an attempt to authorize the taking of property not for public use and without due process of law, and for this and other reasons void.

By § 109 of the act the right of a tenant to occupy any hotel, apartment, or "rental property," i. e., any building

or part thereof, other than hotel or apartment, (§ 101), is to continue notwithstanding the expiration of his term, at the option of the tenant, subject to regulation by the Commission appointed by the act, so long as he pays the rent and performs the conditions as fixed by the lease or as modified by the Commission. It is provided in the same section that the owner shall have the right to possession "for actual and bona fide occupancy by himself, or his wife, children, or dependents . . . upon giving thirty days' notice in writing." According to his affidavit Hirsh wanted the premises for his own use, but he did not see fit to give the thirty days' notice because he denied the validity of the act. The statute embodies a scheme or code which it is needless to set forth, but it should be stated that it ends with the declaration in § 122 that the provisions of Title II are made necessary by emergencies growing out of the war, resulting in rental conditions in the District dangerous to the public health and burdensome to public officers, employees and accessories, and thereby embarrassing the Federal Government in the transaction of the public business. As emergency legislation the Title is to end in two years unless sooner repealed.

No doubt it is true that a legislative declaration of facts that are material only as the ground for enacting a rule of law, for instance, that a certain use is a public one, may not be held conclusive by the Courts. *Shoemaker* v. *United States*, 147 U. S. 282, 298. *Hairston* v. *Danville & Western Ry. Co.*, 208 U. S. 598, 606. *Prentis* v. *Atlantic Coast Line Co.*, 211 U. S. 210, 227. *Producers Transportation Co.* v. *Railroad Commission*, 251 U. S. 228, 230. But a declaration by a legislature concerning public conditions that by necessity and duty it must know, is entitled at least to great respect. In this instance Congress stated a publicly notorious and almost world-wide fact. That the emergency declared by the statute did exist

must be assumed, and the question is whether Congress was incompetent to meet it in the way in which it has been met by most of the civilized countries of the world.

The general proposition to be maintained is that circumstances have clothed the letting of buildings in the District of Columbia with a public interest so great as to justify regulation by law. Plainly circumstances may so change in time or so differ in space as to clothe with such an interest what at other times or in other places would be a matter of purely private concern. It is enough to refer to the decisions as to insurance, in *German Alliance Insurance Co.* v. *Lewis*, 233 U. S. 389; irrigation, in *Clark* v. *Nash*, 198 U. S. 361; and mining, in *Strickley* v. *Highland Boy Gold Mining Co.*, 200 U. S. 527. They sufficiently illustrate what hardly would be denied. They illustrate also that the use by the public generally of each specific thing affected cannot be made the test of public interest, *Mt. Vernon-Woodberry Cotton Duck Co.* v. *Alabama Interstate Power Co.*, 240 U. S. 30, 32, and that the public interest may extend to the use of land. They dispel the notion that what in its immediate aspect may be only a private transaction may not be raised by its class or character to a public affair. See also *Noble State Bank* v. *Haskell*, 219 U. S. 104, 110, 111.

The fact that tangible property is also visible tends to give a rigidity to our conception of our rights in it that we do not attach to others less concretely clothed. But the notion that the former are exempt from the legislative modification required from time to time in civilized life is contradicted not only by the doctrine of eminent domain, under which what is taken is paid for, but by that of the police power in its proper sense, under which property rights may be cut down, and to that extent taken, without pay. Under the police power the right to erect buildings in a certain quarter of a city may be limited to from eighty to one hundred feet. *Welch* v.

*Swasey,* 214 U. S. 91. Safe pillars may be required in coal mines. *Plymouth Coal Co.* v. *Pennsylvania,* 232 U. S. 531. Billboards in cities may be regulated. *St. Louis Poster Advertising Co.* v. *St. Louis,* 249 U. S. 269. Watersheds in the country may be kept clear. *Perley* v. *North Carolina,* 249 U. S. 510. These cases are enough to establish that a public exigency will justify the legislature in restricting property rights in land to a certain extent without compensation. But if to answer one need the legislature may limit height to answer another it may limit rent. We do not perceive any reason for denying the justification held good in the foregoing cases to a law limiting the property rights now in question if the public exigency requires that. The reasons are of a different nature but they certainly are not less pressing. Congress has stated the unquestionable embarrassment of Government and danger to the public health in the existing condition of things. The space in Washington is necessarily monopolized in comparatively few hands, and letting portions of it is as much a business as any other. Housing is a necessary of life. All the elements of a public interest justifying some degree of public control are present. The only matter that seems to us open to debate is whether the statute goes too far. For just as there comes a point at which the police power ceases and leaves only that of eminent domain, it may be conceded that regulations of the present sort pressed to a certain height might amount to a taking without due process of law. *Martin* v. *District of Columbia,* 205 U. S. 135, 139.

Perhaps it would be too strict to deal with this case as concerning only the requirement of thirty days' notice. For although the plaintiff alleged that he wanted the premises for his own use the defendant denied it and might have prevailed upon that issue under the act. The general question to which we have adverted must be decided, if not in this then in the next case, and it should

be disposed of now.—The main point against the law is that tenants are allowed to remain in possession at the same rent that they have been paying, unless modified by the Commission established by the act; and that thus the use of the land and the right of the owner to do what he will with his own and to make what contracts he pleases are cut down. But if the public interest be established the regulation of rates is one of the first forms in which it is asserted, and the validity of such regulation has been settled since *Munn* v. *Illinois*, 94 U. S. 113. It is said that a grain elevator may go out of business whereas here the use is fastened upon the land. The power to go out of business, when it exists, is an illusory answer to gas companies and waterworks, but we need not stop at that. The regulation is put and justified only as a temporary measure. See *Wilson* v. *New*, 243 U. S. 332, 345, 346. *Fort Smith & Western R. R. Co.* v. *Mills*, 253 U. S. 206. A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change.

Machinery is provided to secure to the landlord a reasonable rent. § 106. It may be assumed that the interpretation of "reasonable" will deprive him in part at least of the power of profiting by the sudden influx of people to Washington caused by the needs of Government and the war, and thus of a right usually incident to fortunately situated property—of a part of the value of his property as defined in *International Harvester Co.* v. *Kentucky*, 234 U. S. 222. *Southern Ry. Co.* v. *Greene*, 216 U. S. 400, 414. But while it is unjust to pursue such profits from a national misfortune with sweeping denunciations, the policy of restricting them has been embodied in taxation and is accepted. It goes little if at all farther than the restriction put upon the rights of the owner of money by the more debatable usury laws. The preference given to the tenant in possession is an almost necessary incident of the policy and is traditional in English law. If the tenant

·158 · OCTOBER TERM, 1920.

McKENNA, J., WHITE, Ch. J., and others, dissenting. 256 U. S.

remained subject to the landlord's power to evict, the attempt to limit the landlord's demands would fail.

Assuming that the end in view otherwise justified the means adopted by Congress, we have no concern of course with the question whether those means were the wisest, whether they may not cost more than they come to, or will effect the result desired. It is enough that we are not warranted in saying that legislation that has been resorted to for the same purpose all over the world, is futile or has no reasonable relation to the relief sought. *Chicago, Burlington & Quincy R. R. Co.* v. *McGuire*, 219 U. S. 549, 569.

The statute is objected to on the further ground that landlords and tenants are deprived by it of a trial by jury on the right to possession of the land. If the power of the Commission established by the statute to regulate the relation is established, as we think it is, by what we have said, this objection amounts to little. To regulate the relation and to decide the facts affecting it are hardly separable. While the act is in force there is little to decide except whether the rent allowed is reasonable, and upon that question the courts are given the last word. A part of the exigency is to secure a speedy and summary administration of the law and we are not prepared to say that the suspension of ordinary remedies was not a reasonable provision of a statute reasonable in its aim and intent. The plaintiff obtained a judgment on the ground that the statute was void, root and branch. That judgment must be reversed.

*Judgment reversed.*

MR. JUSTICE McKENNA, with whom concurred THE CHIEF JUSTICE, MR. JUSTICE VAN DEVANTER and MR. JUSTICE McREYNOLDS, dissenting:

THE CHIEF JUSTICE, MR. JUSTICE VAN DEVANTER, MR. JUSTICE McREYNOLDS and I dissent from the opinion

and judgment of the court. The grounds of dissent are the explicit provisions of the Constitution of the United States; the specifications of the grounds are the irresistible deductions from those provisions and, we think, would require no expression but for the opposition of those whose judgments challenge attention.

The National Government by the Fifth Amendment to the Constitution, and the States by the Fourteenth Amendment, are forbidden to deprive any person of "life, liberty, or property, without due process of law." A further provision of the Fifth Amendment is that private property cannot be taken for public use, without just compensation. And there is a special security to contracts in § 10 of Article I in the provision that "No State shall . . . pass any . . . law impairing the obligation of contracts. . . ." These provisions are limitations upon the national legislation, with which this case is concerned, and limitations upon state legislation, with which *Marcus Brown Holding Co.* v. *Feldman, post,* 170, is concerned. We shall more or less consider the cases together, as they were argued and submitted on the same day and practically depend upon the same principles; and what we say about one applies to the other.

The statute in the present case is denominated "The Rent Law" and its purpose is to permit a lessee to continue in possession of leased premises after the expiration of his term, against the demand of his landlord and in direct opposition to the covenants of the lease, so long as he pays the rent and performs the conditions as fixed by the lease or as modified by a commission created by the statute. This is contrary to every conception of leases that the world has ever entertained, and of the reciprocal rights and obligations of lessor and lessee.

As already declared, the provisions of the Constitution seem so direct and definite as to need no reinforcing words and to leave no other inquiry than, Does the statute under

review come within their prohibition? It is asserted, that the statute has been made necessary by the conditions resulting from the "Imperial German war." The thought instantly comes that the country has had other wars with resulting embarrassments, yet they did not induce the relaxation of constitutional requirements nor the exercise of arbitrary power. Constitutional restraints were increased, not diminished. However, it may be admitted that the conditions presented a problem and induced an appeal for government remedy. But we must bear in mind that the Constitution is, as we have shown, a restraint upon government, purposely provided and declared upon consideration of all the consequences of what it prohibits and permits, making the restraints upon government the rights of the governed. And this careful adjustment of power and rights makes the Constitution what it was intended to be and is, a real charter of liberty, receiving and deserving the praise that has been given it as "the most wonderful work ever struck off at any given time by the brain and purpose of man." And we add that more than a century of trial "has certainly proven the sagacity of the constructors, and the stubborn strength of the fabric."

The "strength of the fabric" can not be assigned to any one provision, it is the contribution of all, and, therefore, it is not the expression of too much anxiety to declare that a violation of any of its prohibitions is an evil—an evil in the circumstance of violation, of greater evil because of its example and malign instruction. And against the first step to it this court has warned, expressing a maxim of experience,—"*Withstand beginnings.*" *Boyd* v. *United States*, 116 U. S. 616, 635. Who can know to what end they will conduct?

The facts of this litigation point the warning. Recurring to them, we may ask, Of what concern is it to the public health or the operations of the Federal Government who

shall occupy a cellar, and a room above it, for business purposes in the City of Washington?—(the question in this case); and, Why is it the solicitude of the police power of the State of New York to keep from competition an apartment in the City of New York?—(the question in the other case). The answer is, to supply homes to the homeless. It does not satisfy. If the statute keeps a tenant in, it keeps a tenant out, indeed, this is its assumption. Its only basis is, that tenants are more numerous than landlords and that in some way this disproportion, it is assumed, makes a tyranny in the landlord, and an oppression to the tenant, notwithstanding the tenant is only required to perform a contract entered into, not under the statute, but before the statute; and that the condition is remedied by rent fixing—value adjustment—by the power of the Government. And this, it is the view of the opinion, has justification because "space in Washington is limited" and "housing is a necessary of life." A causative and remedial relation in the circumstances we are unable to see. We do see that the effect and evil of the statute is that it withdraws the dominion of property from its owner, superseding the contracts that he confidently made under the law then existing and subjecting them to the fiat of a subsequent law.

If such exercise of government be legal, what exercise of government is illegal? Houses are a necessary of life, but other things are as necessary. May they too be taken from the direction of their owners and disposed of by the Government? Who supplies them, and upon what inducement? And, when supplied, may those who get them under promise of return, and who had no hand or expense in their supply, dictate the terms of retention or use, and be bound by no agreement concerning them?

An affirmative answer seems to be the requirement of the decision. If the public interest may be concerned, as in the statute under review, with the control of any form

of property, it can be concerned with the control of all forms of property. And, certainly, in the first instance, the necessity or expediency of control must be a matter of legislative judgment. But, however, not to go beyond the case—if the public interest can extend a lease it can compel a lease; the difference is only in degree and boldness. In one as much as in the other, there is a violation of the positive and absolute right of the owner of the property. And it would seem, necessarily, if either can be done, unoccupied houses or unoccupied space in occupied houses can be appropriated. The efficacy of either to afford homes for the homeless cannot be disputed. In response to an inquiry from the bench, counsel replied that the experiment had been tried or was being tried in a European country. It is to be remembered, that the legality of power must be estimated not by what it will do but by what it can do.

The prospect expands and dismays when we pass outside of considerations applicable to the local and narrow conditions in the District of Columbia. It is the assertion of the statute that the Federal Government is embarrassed in the transaction of its business, but, as we have said, a New York statute is submitted to us and counsel have referred to the legislation of six other States. And, there is intimation in the opinion that Congress in its enactment has imitated the laws of other countries. The facts are significant and suggest the inquiry, Have conditions come, not only to the District of Columbia, embarrassing the Federal Government, but to the world as well, that are not amenable to passing palliatives, so that socialism, or some form of socialism, is the only permanent corrective or accommodation? It is indeed strange that this court, in effect, is called upon to make way for it and, through the instrument of a constitution based on personal rights and the purposeful encouragement of individual incentive and energy, to declare legal a power exerted for their destruc-

tion. The inquiry occurs, Have we come to the realization of the observation that "War unless it be fought for liberty is the most deadly enemy of liberty?"

But, passing that, and returning to the Constitution, it will be observed, as we have said, that its words are a restraint upon power, intended as such in deliberate persuasion of its wisdom as against unrestrained freedom.

And it is significant that it is not restraint upon a "Governing One" but restraint upon the people themselves, and in the persuasion, to use the words of one of the supporters of the Constitution, that "the natural order of things is for liberty to yield and for government to gain ground." Sinister interests, its conception is, may move government to exercise; one class may become dominant over another; and, against the tyranny and injustice that will result, the framers of the Constitution believed precautions were as necessary as against any other abuse of power. And so careful is it of liberty that it protects in many provisions the individual against the magistrate.

Has it suddenly become weak—become, not a restraint upon evil government, but an impediment to good government? Has it become an anachronism, and is it to become "an archæological relic," no longer to be an efficient factor in affairs but something only to engage and entertain the studies of antiquarians? Is not this to be dreaded —indeed will it not be the inevitable consequence of the decision just rendered? Let us see what it justifies, and upon what principle! But first and preliminary to that inquiry are the provisions it strikes down. We have given them, but we repeat them. By § 10 of Article I it is provided, "No State shall . . . pass any . . . law impairing the obligation of contracts, . . ." By the Fifth Amendment, no person can be deprived of property without due process of law. The prohibitions need no strengthening comment. They are as absolute as axioms. A contract existing, its obligation is impreg-

164                    OCTOBER TERM, 1920.

McKenna, J., White, Ch. J., and others, dissenting.   256 U. S.

nable. The elements that make a contract or its obligation we need not consider. The present case is concerned with a lease, and that a lease is a contract we do not pause to demonstrate either to lawyers or to laymen, nor that the rights of the lessor are the obligations of the lessee, and, of course, the rights of the lessee are the obligations of the lessor—the mutuality constituting the consideration of the contract—the inducement to it and its value, no less to the lessee than to the lessor.

What were the rights and obligations in the present case and what was the right of Hirsh to control his property? Hirsh is the purchaser of a lot in the City of Washington; Block is the lessee of the lot and he agreed that at the end of his tenancy he would surrender the premises, and this and "each and every one of the covenants, conditions and agreements," he promised "to keep and perform." Hirsh at the end of the term demanded possession. It was refused, and against this suit to recover possession there was pleaded the statute. The defense prevailed in the trial court; the statute was declared unconstitutional in the Court of Appeals. It is sustained by the decision just announced.

It is manifest, therefore, that by the statute the Government interposes with its power to annul the covenants of a contract between two of its citizens and to transfer the uses of the property of one and vest them in the other. The interposition of a commission is but a detail in the power exerted—not extenuating it in any legal sense—indeed, intensifies its illegality, takes away the right to a jury trial from any dispute of fact.

If such power exist, what is its limit and what its consequences? And by consequences we do not mean who shall have a cellar in the City of Washington or who shall have an apartment in a million-dollar apartment house in the City of New York, but the broader consequences of unrestrained power and its exertion against property, having

135.   McKENNA, J., WHITE, Ch. J., and others, dissenting.

example in the present case, and likely to be applied in other cases. This is of grave concern. The security of property, next to personal security against the exertions of government, is of the essence of liberty. They are joined in protection, as we have shown, and both the National Government (Fifth Amendment) and the States (Fourteenth Amendment) are forbidden to deprive any person "of life, liberty, or property, without due process of law," and the emphasis of the Fifth Amendment is that private property cannot be "taken for public use, without just compensation." And, in recognition of the purpose to protect property and the rights of its owner from governmental aggression, the Third Amendment provides, "No soldier shall, in time of peace be quartered in any house, without the consent of the owner, nor in time of war, but in a manner to be prescribed by law."

There can be no conception of property aside from its control and use, and upon its use depends its value. *Branson* v. *Bush*, 251 U. S. 182, 187. Protection to it has been regarded as a vital principle of republican institutions. It is next in degree to the protection of personal liberty and freedom from undue interference or molestation. *Chicago, Burlington & Quincy R. R. Co.* v. *Chicago*, 166 U. S. 226. Our social system rests largely upon its sanctity, "and that State or community which seeks to invade it will soon discover the error in the disaster which follows." *Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1, 18.

There is not a contention made in this case that this court has not pronounced untenable. An emergency is asserted as a justification of the statute and the impairment of the contract of the lease. A like contention was rejected in *Ex parte Milligan*, 4 Wall. 2. It was there declared (page 120) "that the principles of constitutional liberty would be in peril, unless established by irrepealable law." And it was said that "the Constitution of the United States is a law for rulers and people, equally in war

and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government."

But what is the power that is put in opposition to the Constitution and supersedes its prohibitions? It is not clear from the opinion what it is. The opinion gives to the police power a certain force but its range is not defined. Circumstances, it is said, "have clothed the letting of buildings in the District of Columbia with a public interest so great as to justify regulation by law," though at other times and places such letting may be only of private concern; and the deduction is justified, it is said, by analogy to the business of insurance, the business of irrigation and the business of mining. *German Alliance Insurance Co.* v. *Lewis*, 233 U. S. 389; *Clark* v. *Nash*, 198 U. S. 361; *Strickley* v. *Highland Boy Gold Mining Co.*, 200 U. S. 527. It is difficult to handle the cases or the assertion of what they decide. An opposing denial only is available.

To us the difference is palpable between life insurance and the regulation of its rates by the State and the exemption of a lessee from the covenants of his lease with the approval of the State, in defiance of the rights of the lessor. And as palpably different is the use of water for mining or irrigation or manufacturing, and eminent domain exercised for the procurement of its means with the requirement of compensation, and as palpably different is eminent domain, with attendant compensation, exercised for railways and other means for the working of mines.

And there is less analogy in laws regulating the height of buildings in business sections of a city; or the requirement of boundary pillars in coal mines to safeguard the employees of one in case the other should be abandoned and allowed to fill with water; or the regulation of bill-boards

135.    McKENNA, J., WHITE, Ch. J., and others, dissenting.

in cities on account of their menace to morality, health and decency (in what way it is not necessary to specify); or the keeping clear of watersheds to protect the water reservoirs of cities from damage by devastating fires or the peril of them, from accumulation of "tree tops, boughs and lops" left upon the ground.[1]

The cases and their incidents hardly need explanatory comment. They justify the prohibition of the use of property to the injury of others, a prohibition that is expressed in one of the maxims of our jurisprudence. Such use of property is, of course, within the regulating power of government. It is one of the objects of government to prevent harm by one person to another by any conduct.

The police power has some pretense for its invocation. Regarding alone the words of its definition, it embraces power over everything under the sun, and the line that separates its legal from its illegal operation can not be easily drawn. But it must be drawn. To borrow the illustration of another, the line that separates day from night can not be easily discerned or traced, yet the light of day and the darkness of night are very distinct things. And as distinct in our judgment is the puissance of the Constitution over all other ordinances of power, and as distinct are the cited cases from this case; and if they can bear the extent put upon them, what extent can be put upon the case at bar or upon the limit of the principle it declares? It is based upon the insistency of the public interest and its power. As we understand, the assertion is, that legislation can regard a private transaction as a matter of public interest. It is not possible to express the possession or exercise of more unbounded or irresponsible power. It is true, in mitigation of this declaration and of the alarm that it causes, it is said that the declara-

---

[1] *Welch* v. *Swasey*, 214 U. S. 91; *Plymouth Coal Co.* v. *Pennsylvania,* 232 U. S. 531; *St. Louis Poster Advertising Co.* v. *St. Louis*, 249 U. S. 269; *Perley* v. *North Carolina,* 249 U. S. 510.

tion is not necessarily conclusive on the courts, but "is entitled, at least, to great respect." This is intangible to measurement or brief answer. But we need not beat about in generalities or grope in their indetermination in subtle search for a test of a legal judgment upon the conditions, or the power exerted for their relief. "The Rent Law" is brought to particularity by the condemnation of the Constitution of the United States. Call it what you will—an exertion of police or other power— nothing can absolve it from illegality. Limiting its duration to two years certainly cannot. It is what it does that is of concern. Besides, it is not sustained as the expedient of an occasion, the insistence of an emergency, but as a power in government over property based on the decisions of this court whose extent and efficacy the opinion takes pains to set forth and illustrate. And as a power in government, if it exist at all, it is perennial and universal and can give what duration it pleases to its exercise, whether for two years or for more than two years. If it can be made to endure for two years, it can be made to endure for more. There is no other power that can pronounce the limit of its duration against the time expressed in it, and its justification practically marks the doom of judicial judgment on legislative action.

The wonder comes to us, What will the country do with its new freedom? Contracts and the obligation of contracts are the basis of its life and of all its business, and the Constitution, fortifying the conventions of honor, is their conserving power. Who can foretell the consequences of its destruction or even question of it? The case is concerned with the results of the German war and we are reminded thereby that there were contracts made by the National Government in the necessity or solicitude of the conduct of the war— contracts into which patriotism eagerly entered, but, it may be, interest was enticed, by the promise of exemp-

tion from a burden of government. Burdens of government are of the highest public interest, and their discharge is of imperious necessity. Therefore, the provocation or temptation may come to those who feel them that the property of others (estimated in the millions, perhaps) should not have asylum from a share of the load. And what answer can be made to such demand within the principle of the case now decided? Their promises are as much within the principle as the lease of Hirsh is, for, necessarily, if one contract can be disregarded in the public interest every contract can be; patriotic honor may be involved in one more than in another, but degrees of honor may not be attended to—the public interest being regarded as paramount. At any rate, does not the decision just delivered cause a dread of such result and take away assurance of security and value from the contracts and their evidences? And it is well to remember that other exigencies may come to the Government making necessary other appeals. The Government can only offer the inducement and security of its bonds, but who will take them if doubt can be thrown upon the integrity of their promises under the conception of a public interest that is superior to the Constitution of the United States?

It comes to our recollection also that some States of the Union, in consummation of what is conceived to be a present necessity, have also entered into contracts of like kind. They, too, may come under a subsequent declaration of an imperious public interest and their promises be made subject to it.

The prophecy is not unjustified. This court has at times been forced to declare particular state laws void for their attempted impairment of the obligation of contracts. To accusations hereafter of such an effect of a state law this decision will be opposed, and the conception of the public interest.

Indeed, we ask, may not the State have other interests besides the nullification of contracts, and may not its police power be exerted for their consummation? If not, why not? Under the decision just announced, if one provision of the Constitution may be subordinated to that power, may not other provisions be? At any rate, the case commits the country to controversies, and their decision, whether for the supremacy of the Constitution or the supremacy of the power of the States, will depend upon the uncertainty of judicial judgment.