PARKER et al. v. PORTER, Price Adm'r.
No. 271.

United States Emergency Court of Appeals.

Heard at New York Jan. 18, 1946.
Decided March 13, 1946.
Writ of Certiorari Granted May 13, 1946.
See 66 S.Ct. 1024.

McALLISTER, Judge, dissenting.

———◆———

Jacob D. Hyman, Associate Gen. Counsel, of Washington, D. C. (Richard H. Field, Gen. Counsel, Office of Price Administration, of Washington, D. C., on the brief), for the respondent.

Louis L. Tetelman, of New York City, amicus curiae.

Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.

MARIS, Chief Judge.

The complainants are tenants of apartments in an apartment house located at 55 Central Park West, New York City, owned by the 55 Corporation. They seek to set aside orders of the Price Administrator issued under section 6(b) (2) of the Rent Regulation for Housing in the New York City Defense-Rental Area[1] which granted to certain purchasers of stock of the 55 Corporation who had acquired with their stock proprietary leases of the apartments in question certificates authorizing them to pursue their legal remedies for the eviction of the tenants. The latter filed a joint protest against the Administrator's orders which the Administrator dismissed. The tenants thereupon filed the present complaint in this court under Section 204(a) of the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 924(a). The Administrator has moved to dismiss the complaint upon the ground that the complainants are without standing to file it.

Section 204(a) provides that only a person aggrieved by the denial of his protest may file his complaint under that section. Such a complainant must therefore have had standing to file a protest under Section 203(a), 50 U.S.C.A.Appendix, § 923(a). Under that section, however, only a person "subject to" a provision of a regulation or order may file a protest against it. We are therefore presented with the question whether a tenant of a housing accommodation with respect to which the Administrator has ordered a certificate of eviction to be issued is a person subject to that order within the meaning of Section 203(a).

The Administrator contends that a person is subject to a regulation or order within the meaning of Section 203(a) only if the regulation or orders prohibits or requires action by him. In support of this contention he refers to the legislative history of the Act[2] as well as to the decision of this court in Buka Coal v. Brown, Em.App., 1943, 133 F.2d 949. He also calls attention to the fact that he has so construed this phrase in his procedural regulations from their inception.[3]

The Administrator's contention in this respect loses some of its force, however, when it is recalled that on November 2, 1942,[4] in revising Procedural Regulation No. 1 he included in Section 1300.24 (which carried forward the provisions of Section 1300.9 of the original regulation) the proviso: "That a producer of an agricultural commodity shall be considered to be subject to a maximum price regulation for the purpose of asserting any right created by section 3(c) of the Emergency Price Control Act of 1942 * * * for

---

[1] 8 F.R. 13914.

[2] Sen.Rep.No.931, 77th Cong., 2d Sess. (1942), p. 22: "Section 203(a) is designed to provide the advantages of a hearing, in a manner consistent with the need for expeditious determinations, to all persons who are required to obey the provisions of regulations or orders under section 2."

[3] Section 1300.9 of Procedural Regulation No. 1 issued February 12, 1942 (7 F.R. 971): "A person is, for the purpose of this Regulation, (§§ 1300.1 to 1300.56, incl.) subject to a provision of a maximum price regulation only if such provision prohibits or requires action by him."

Section 1300.215 of Revised Procedural Regulation No. 3 issued January 12, 1943 (8 F.R. 526): "A landlord is, for the purposes of this regulation, subject to a provision of a maximum rent regulation or of an order, only if such provision prohibits or requires action by him."

[4] Revised Procedural Regulation No. 1, Section 1300.24, 7 F.R. 8961.

the benefit of producers of such an agricultural commodity."

Since such regulations do not prohibit or require action by farmers this proviso clearly extends the concept of the phrase in question beyond that here contended for. Moreover in Illinois Packing Co. v. Snyder, Em.App., 1945, 151 F.2d 337, this court held that a person who contended that he was arbitrarily and capriciously discriminated against in a regulation providing for the payment of subsidies was a person subject to the regulation within the meaning of Section 203(a). We think, therefore, that it cannot be said that the right to file a protest against a regulation or order issued under Section 2 of the Emergency Price Control Act must in all cases be restricted to the extent for which the Administrator here contends.

■ The question then is whether in the case before us, that of tenants of housing accommodations, it is the purpose of the Act to accord the tenants administrative and judicial review of the action of the Administrator in permitting their landlords to undertake eviction proceedings against them. We think that the answer to this question depends upon whether the orders in controversy deprived the tenants of the opportunity to enjoy a right of possession which was vested in them and which they would have been entitled to enforce except for those orders. If the orders did deprive them of the opportunity to enforce and enjoy such a vested right they were subject to them within the meaning of the Act and, therefore, entitled to protest them. If, on the other hand, the tenants had no such vested right the orders deprived them of nothing to which they were entitled. Under such circumstances they could hardly be said to be subject to the orders in any real sense and would, therefore, have no standing to protest them.

The so-called certificates of eviction which the Administrator issued did not themselves authorize or require the tenants' eviction. Nor did they operate to deprive the tenants of any right to possession which they otherwise had under their leases or the laws of New York. The certificates merely removed the ban of Section 6 of the Rent Regulation for Housing

against eviction and left the landlords free to employ any remedies which the leases and the local law gave them for the recovery of possession if they could show that they were entitled to it. Consequently the only right which the certificates of eviction could possibly be said to have jeopardized was the right, if any, to possession of their apartments which the Emergency Price Control Act and the Rent Regulation for Housing conferred upon the tenants by virtue of the ban of Section 6 of the Regulation against eviction. Only if the Act and Regulation conferred such a right upon the tenants did they have standing to file their protest and the present complaint.

■ An examination of the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 901 et seq., however, discloses that it was not one of its purposes to give to tenants any right to remain in possession of the defense-area housing accommodations which they might happen to occupy. When Congress has seen fit to make such a provision for tenants it has used apt language to express its purpose [5] but it did not do so in this case. Its sole purpose here, so far as defense-area housing accommodations are concerned, was to control the amount of rents of such accommodations and to prevent speculative, unwarranted and abnormal increases therein. The only reference in the Act to the possession of housing accommodations is contained in Section 2(d), which, in this respect provides: "(d) Whenever in the judgment of the Administrator such action is necessary or proper in order to effectuate the purposes of this Act, he may, by regulation or order, regulate or prohibit * * * speculative or manipulative practices or renting or leasing practices (including practices relating to recovery of the possession) in connection with any defense-area housing accommodations, which in his judgment are equivalent to or are likely to result in * * * rent increases, * * * inconsistent with the purposes of this Act."

■ It will thus be seen that the power to regulate practices relating to recovery of the possession of defense-area housing accommodations is given to the Administrator only incident to his power to prevent

[5] District of Columbia Rents Act of October 22, 1919, c. 80, § 109, 41 Stat. 298, 301, construed in Block v. Hirsh, 1921, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165; Soldiers & Sailors Civil Relief Act of 1940, § 300, 54 Stat. 1178, 1181, 50 U.S.C.A.Appendix, § 530.

improper rent increases and evasive practices likely to result in such increases. Only to this necessary extent is the vested right of a landlord to recover possession of his property to be restrained by the Administrator under the Act. The language of Section 6 of the Rent Regulation for Housing which bans the removal of tenants except under certain circumstances and provides for the issuance of certificates of eviction must be read in this light. If construed as extending to cases which do not involve the possibility of practices likely to result in rent increases it would lose its statutory support. Compare Taylor v. Bowles, Em.App., 1944, 145 F.2d 833.

■ It will, of course, be conceded that most tenants of defense-area housing accommodations do in fact enjoy a substantial measure of protection against eviction as a result of the Regulation's prohibition against eviction except under circumstances found by the Administrator not to be susceptible to manipulation tending to evade rent ceilings. But neither the Act nor the Rent Regulation for Housing gives to any tenant any vested or enforceable right of possession as against his landlord which he would not otherwise have under his lease or the local law. This becomes clear when it is considered that the ban against eviction imposed by Section 6 of the Rent Regulation finds its only justification and support in the possibility that the landlords to which it applies may otherwise use eviction proceedings in order to compel the payment of increased rents. It is not imposed and under the Act it may not be imposed because of any necessities of the tenant or his inability to secure other housing accommodations.

■ It follows that when the Administrator has determined, as he did here, that eviction will not be inconsistent with the purpose of the Act to prevent rent increases, no rights of the tenants have been affected so as to give them standing to protest. This is true even though, as here, the Administrator invited statements from the tenants in response to the landlord's petitions and permitted them to participate in the oral hearing of these petitions. This was doubtless wise administrative procedure which enabled the Administrator to become fully informed with respect to all the facts which might have any bearing upon the questions raised by the petitions but it did not, as the complainants urge, make the tenants parties to the proceedings. It will be seen that

this must be so when it is remembered that no showing which any one of the tenants might have made with respect to his own situation and necessities could have had the slightest bearing upon the Administrator's determination of the question raised by the landlords' petitions. That question at bottom was simply whether the landlords had shown that their proposed eviction proceedings were of a character which did not involve the possibility of increasing rents in derogation of the war effort. The tenants' interest with respect to this question was no different in character from the interest of the public generally.

■■ What has been said disposes of the complainants' contention that the failure to accord them administrative and judicial review of the Administrator's action violates the due process clause of the Fifth Amendment. For the issuance by the Administrator of his so-called eviction certificates did not deprive the complainants of any vested right under their leases or the local law to the possession of the defense-area housing accommodations which they occupy. Since, as we have seen, neither the Emergency Price Control Act nor the Rent Regulation for Housing gives them such a right, the Administrator's action cannot be said to have constituted a deprivation of their property with respect to which due process of law was required. The mere fact that they may be prevented from enjoying an incidental and fortuitous benefit under the Act does not have that effect. Compare Pennie v. Reis, 1899, 132 U.S. 464 10 S.Ct. 149, 33 L.Ed. 426; Violet Trapping Co. v. Grace, 1936, 297 U.S. 119, 56 S.Ct. 386, 80 L.Ed. 518; Ingraham v. Hanson, 1936, 297 U.S. 378, 56 S.Ct. 511, 80 L.Ed. 728; Wright v. Central Ky. Gas Co., 1936, 297 U.S. 537, 56 S.Ct. 578, 80 L.Ed. 850: Dodge v. Board of Education, 1937, 302 U.S. 74, 58 S.Ct. 98, 82 L.Ed. 57.

A judgment will be entered dismissing the complaint.

MAGRUDER, Judge (concurring).

With some hesitation I concur in the opinion by Chief Judge MARIS. The phrase "subject to" is of undefined content, and a reviewing court must necessarily develop its more exact meaning from case to case, bearing in mind the general scheme and purpose of the Act. A relevant consideration in this connection is whether a decision by this court opening the door to

judicial review in the particular type of case would produce consequences harmful to the efficient administration of the Act.

In general it can be said that judicial review is available to sellers of commodities and landlords having housing accommodations to rent—persons whose activities are put under constraint by the mechanisms of governmental price control. The Price Administrator represents the interests of buyers and tenants in the battle against inflation, and there is no indication in the legislative history of the Act that Congress intended to bring the regulations or orders of the Administrator under judicial review at the instance of buyers or tenants.

Certainly tenants as a class are not entitled to protest a rent regulation on the ground that it froze rents in the defense-rental area at too high a level. I cannot see that a tenant is in any stronger position when the order he objects to is not of general applicability but is one affecting the particular premises he is occupying. Under the various adjustment provisions of the Rent Regulation for Housing, Area Rent Directors issue hundreds of orders giving landlords individual increases of maximum rents. It is important to the fair administration of the Act that relief in these cases be given promptly and with a minimum of red tape. Yet if we accept the reasoning in Judge McALLISTER'S dissenting opinion, it would seem necessarily to follow that orders granting landlords' applications for adjustment of maximum rents would be protestable by the tenants affected—thereby imperiling the efficient administration of the Act.

We have upheld the provisions of the Rent Regulation restricting the eviction of tenants as being appropriate to effective rent control and authorized under § 2(d) of the Act. Taylor v. Brown, 1943, 137 F.2d 654, 662, certiorari denied 1943, 320 U.S. 787, 64 S.Ct. 194, 88 L.Ed. 473. The landlord in most instances must obtain from the Administrator a certificate of eviction before pursuing his remedies under the local law for the recovery of possession. Some administrative delay is unavoidable before the landlord is free to proceed. See Taylor v. Bowles, Em.App., 1944, 145 F.2d 833. The Administrator must first be satisfied that evictions of the character proposed are not inconsistent with the purposes of the Act or of the Regulation and would not be likely to result in the circumvention or evasion thereof. In mak-

ing this determination the Administrator acts in protection of the interest of the tenant. Once the determination is made in favor of the landlord, the tenant has no further legal interest in continued possession beyond what his contract and the local law give him. It would render somewhat illusory the landlord's right to recover possession if he were now subject to further delay during the pendency of protest proceedings instituted by the tenant, followed by review proceedings in this court.

Chief Judge MARIS concurs in the foregoing views.

McALLISTER, Judge (dissenting).

When the purchasers of stock in the Fifty-Five Corporation filed petitions for certificates of eviction pursuant to Section 6(b) (2) of the Rent Regulation of Housing in the New York City Defense-Rental Area, authorizing them to proceed under the local law to evict the complainants herein from their apartments, the Office of Price Administration, in accordance with its established practice, served copies of the petition, together with notices on all of the tenants concerned, advising them that they might submit any information they desired with reference to the matter, and stating that failure to return the petition with their signed statements would result in the entry of an order upon the basis of the facts available to the Rent Director.

Under Section 6(a) of the New York Rent Regulations a tenant who pays the rent to which the landlord is entitled may *not be removed from any housing* accommodations by action to evict or to recover possession or by exclusion from possession or otherwise, notwithstanding such tenant has no lease, or that his lease or other rental agreement has expired or otherwise terminated, and regardless of any contract, lease agreement or obligation entered into which provides for entry of judgment upon tenant's confession of breach of covenants, or which contains provisions contrary to the regulations with certain exceptions not relevant to the present situation. However, under the Regulation, it is provided that a purchaser of leased premises may secure occupancy thereof, provided that the Office of Price Administration grant his application for a certificate authorizing the pursuit of local remedies to remove or evict a

tenant of the vendor. Under the sections of the Regulation which provide for the filing of the petition authorizing pursuit of local remedies of eviction, the Administrator makes such investigation of the application as he deems proper prior to a determination as to whether such certificate shall be granted. Briefly, then, the tenants in this case, are entitled to occupancy of the apartments, unless a purchaser of the premises, complying with the regulations, is authorized by the Office of Price Administration to evict such tenants, and thereafter secures a judgment of eviction in the local courts.

The persons filing the petitions for certificates of eviction alleged that they were purchasers and holders of proprietary leases in the apartments occupied by the tenants, under a cooperative ownership plan, sponsored by the owners of the entire capital stock of the Fifty-Five Corporation. The latter had sought to convert twenty-eight apartments into cooperatives by offering for sale shares of stock of such owning corporation which they held, to purchasers, including the purchasers herein, with proprietary leases for a term of years, of the apartments involved. The purchase price for such apartments under the proposed sharing of ownership plan aggregated approximately $390,000 over and above a first mortgage of $1,500,000.

While the cooperative was being organized, the managing agents of the owning corporation wrote the Chief Attorney for the New York City Defense-Rental Area, of the Office of Price Administration, on March 5, 1945, requesting an interpretation concerning the right of purchasers of such cooperative apartments in 55 Central Park West, to obtain certificates of eviction under the provisions of Subdivision II of Section 6(b) (3) of the Rent Regulations of the Office of Price Administration. This section provides that where a cooperative is organized on or after February 17, 1945, no certificate of eviction shall be issued, unless on such date, stock in the cooperative had been purchased by persons who were then tenants of at least 80% of the apartments in the premises, or unless on such date the cooperative was in the process of organization and the Administrator finds that substantial hardship would result from the failure to issue such a certificate.

The owners and brokers based their application for an interpretation on the latter portion of the section—that is, on the claim that substantial hardship would result to the owners of the capital stock of the corporation if they were not permitted to proceed with the conversion of some of the apartments into cooperatives under the regulations existing prior to February 17, 1945. Annexed to their letter requesting the interpretation of the right of purchasers of such cooperative apartments to obtain certificates of eviction were certain affidavits and exhibits. On March 23, 1945, an interpretation of hardship, in favor of the owning corporation, was granted by the Office of Price Administration—erroneously, and because of fraudulent misrepresentations, as contended by the tenants —and the representatives of the owning corporation were authorized to proceed with the share-ownership plan under the regulations in existence prior to February 17, 1945. Thereafter, the alleged purchasers of the apartments involved herein applied for certificates of eviction from the Price Administrator, based on a claimed compliance with Section 6(b) (2) of the Rent Regulation for Housing in the City of New York, in effect prior to February 17, 1945, which required that the purchasers of stock for the purpose of carrying out the cooperative ownership plan, must have paid 20% of the equity and the underlying obligation of the corporation, attributable to their apartments at the time of their stock purchase.

When the foregoing applications were made for certificates of eviction, and the Office of Price Administration served copies of the petition with request for statements upon the tenants, the various tenants filed statements objecting to the granting of certificates of eviction; and the proceeding was thereafter referred to the Chief Branch Attorney of the New York City Defense-Rental Area, who on a hearing took approximately 1,000 pages of testimony. He subsequently recommended denial of the applications for certificates of eviction, giving as reasons that the purchasers did not fulfill the obligation of making payment of 20% of the equity and underlying obligation of the corporation attributable to their apartments, as required by the Housing Regulation; that the letter of interpretation as to hardship issued by the Administrator, and interposed in the proceedings, was based upon misrepresentations and fraudulent statements by the real estate brokers who were acting as managers and agents for the owning

corporation; that the entire presentation of the share-ownership plan by the sponsors was permeated with the implication that it was a very substantial financial transaction involving important financial commitments on the part of the sponsors, whereas the actual fact was they had not a penny invested but were operating on an option, in the final exercise of which they hypothecated the very shares of stock, which had been sold to purchasers, after payment therefor had been made, for a loan of $40,000 from a New York bank; and that this loan was for the purpose of enabling the sponsors to buy three apartments, none of which they intended to occupy, but for the sole purpose of showing a greater number of sales than were actually consummated.

The findings and recommendations of the Chief Branch Attorney were sustained by the Area Rent Director of the City of New York, and were thereafter confirmed by the Acting Regional Administrator of the Office of Price Administration for Region II in an opinion in which he stated that the purchasers had not complied with the provisions of Section 6(b) (3) of the Rent Regulation of the Office of Price Administration which required that certificates relating to eviction should only be issued if 80% of the tenants in occupancy at the time of the issuance of the certificates became purchasers of their apartments. The Acting Regional Administrator further denied the claim that the purchasers were entitled to the certificates under the "hardship" provision under the above section, and sustained the findings of fraud and misrepresentation in the procurement of the letter of interpretation. Thereafter, the action of the Chief Branch Attorney, the Area Rent Director, and the Acting Regional Administrator, was reversed by order of the Price Administrator who granted certificates of eviction to the purchasers.

Upon entry of the order granting certificates of eviction, the tenants concerned filed a protest with the Administrator setting forth that the purchasers failed to comply with Section 6(b) (2) of the Rent Regulation, and in each individual case had paid in cash less than the proportionate share of the 20% of the stock purchase price required to be paid in good faith under that section; that the letter of interpretation was unjustified, uncalled for, unwarranted, and secured without a basis in fact or in law; that the facts and documents submitted by the managers of

the owning corporation seeking the letter of interpretation as to hardship contained misrepresentations and constituted a fraud upon the Administrator; that the owning corporation was not a cooperative corporation or association, and, therefore, did not come within the provisions of the laws and regulations of the Office of Price Administration as to the eviction of tenants of cooperative apartments; that the sponsors of the cooperative plan acted in bad faith throughout the proceedings; that the property owned by the corporation had no equity over and above its encumbrances; and that the plan for the sale of the shares of stock was fraudulent and infected with bad faith and misrepresentation.

The foregoing protest was dismissed by the Price Administrator on November 2, 1945, on the ground that complainants had no standing to protest his order granting certificates of eviction, since Section 203(a) of the Emergency Price Control Act of 1942, as amended, provides that only persons "subject to" a regulation or order may file a protest thereto with the Administrator; that the Rent Regulations issued by the Administrator or his representatives prohibit or require action only by landlords; and that, therefore, only such persons, and not tenants, are "subject to" the regulations and orders within the meaning of the Act.

Section 203(a) of the Emergency Price Control Act provides that "at any time after the issuance of any regulation or order * * *, any person subject to any provision of such regulation, order, or price schedule may * * * file a protest specifically setting forth objections to any such provision * * *." In Buka Coal Co. v. Brown, Em.App., 1943, 133 F.2d 949, 952, it was said that a person is "subject to" a provision of a regulation or order "only if such provision prohibits or requires action by him." The Administrator, therefore, in reliance upon the foregoing, contends that tenants cannot protest the order in this case because they are not "subject to" it, inasmuch as the order granting the purchasers of the apartments authority to proceed with eviction in the local courts does not require or prohibit any action on the part of the tenants, but merely authorizes the purchasers to proceed with their remedies at law to evict; and it is asserted that the Administrator "has consistently construed this phrase as applying *generally* to persons of whom action was prohibited or required by a

particular provision of a regulation or order." (Italics supplied.)

However valid the interpretation relied upon by the Administrator may be with regard to the standing of a person generally to protest a price regulation, as illustrated in the Buka case, it does not follow, invariably, that no one can protest a regulation or order, regardless of its nature, unless such order or regulation prohibits or requires action by such a person. For a person may be "subject to" various regulations and orders of the Administrator, in spite of the fact that they do not prohibit or require action by him. This is seen, for example, in the promulgations of the Administrator himself, where in Section 24 of Revised Procedural Regulation No. 1, he provided for an exception to his interpretation that a person is "subject to" the provision of a maximum price regulation only if such provision prohibits or requires action by him. This exception was provided for the benefit of a producer of an agricultural commodity who may complain that a particular price regulation violates Section 3 of the Emergency Price Control Act, or the Stabilization Act, 50 U.S.C.A.Appendix, § 961 et seq., which are designed to protect such producers against the depressing effect upon their prices, of the processor's ceilings, and is found in the following portion of the section of the Revised Procedural Regulation above mentioned: "Provided, however, That a producer of an agricultural commodity shall be considered to be subject to a maximum price regulation for the purpose of asserting any right created by section 3(c) of the Emergency Price Control Act of 1942, or section 3 of the Act of October 2, 1942 (Pub. Law 729, 77th Cong.) for the benefit of producers of such an agricultural commodity. Any protest filed by a person not subject to the provision protested, or otherwise not in accordance with this revised procedural regulation, may be dismissed by the Administrator."

Obviously, in the foregoing, the Administrator was not adhering to a consistent and uniform construction that a person is not subject to, and, therefore, cannot protest, a regulation, unless, by the terms of such regulation, he is prohibited from taking, or required to take, some action.

Moreover, we have recognized, in Illinois Packing Co v. Snyder, Em.App., 1945, 151 F.2d 337, 338, that the construction of the Statute here sought to be given by the Ad-

ministrator does not apply in a case involving a subsidy regulation where a complainant contends that the regulation contained an unlawful and discriminatory condition which excluded him from the benefit of the subsidy. In that case, the Administrator in answer to the claim of the complainant, insisted, upon the authority of the Buka case, that the complainant had no standing to protest the regulation, because it did not require or prohibit any action by complainant. In passing upon the issue thus tendered, this court said: "In Buka Coal Co. v. Brown, Em.App., 1943, 133 F.2d 949, 952, we accepted the Price Administrator's interpretation of this provision of the Act to the effect that a person is 'subject to' a provision of the maximum price regulation 'only if such provision prohibits or requires action by him.' While this interpretation may be appropriate, so far as concerns the standing of a person to protest a price regulation, it is clearly not an appropriate criterion for determining the standing of a person to protest the kind of regulation now before us, a regulation setting up a scheme of compensatory subsidy payments under defined terms and conditions. If anybody could be 'subject to' a provision of the subsidy regulation, complainant certainly would meet this requirement, since it claims to be excluded from the subsidy by a discriminatory and unlawful condition inserted in the subsidy regulation by Amendment No. 2."

We have seen that producers of agricultural commodities, and claimants to subsidy payments, are considered to be persons subject to the regulations and orders issued by the Administrator, and, therefore entitled to protest such orders. In the one case, the court, contrary to the decision of the Administrator, declared a person "subject to" a regulation, because he had been excluded from its benefits by a discriminatory condition; in the other case, the Administrator, using the large discretion conferred upon him by the Statute, provided by regulation that a party was "subject to" the regulation, when, otherwise, he would have had no claim or standing to file a protest. Why, then, are not the tenants in this case likewise "subject to" the orders of the Administrator granting certificates to the landlord authorizing him to commence eviction proceedings? Eviction would mean, in the present housing emergency, that such tenants with their families including in this case, helplessly stricken invalids, newly

returned veterans of the war, children, and aged people would, in all probability, be deprived of living quarters in the City of New York, where they have been in the past, and are now, bona fide residents. To paraphrase the Illinois Packing Co. case, supra, it would seem that "if anybody could be 'subject to' a provision of the * * * Regulation, complainant [in this case, the tenants] certainly would meet this requirement," by any liberal construction of the Act—and we have heretofore held that the provisions of the Price Control Statute are to be given a liberal construction to effectuate their highly remedial purpose. Automatic Fire Alarm Co. v. Bowles, Em.App., 1944, 143 F.2d 602.

Contrary to the conclusion entertained in the majority opinion, I am of the view that one of the purposes of the Emergency Price Control Act was to give to tenants a right to remain in possession of the defense-rental area housing accommodations which they might happen to occupy, except for good and sufficient reasons to the contrary; and in the following discussion, I shall attempt to set forth the basis for my view.

In the Statement of Purposes of the Price Control Act as set forth in the first section of the Statute, it is declared that "the purposes of this Act are to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; * * * to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors, and persons dependent on life insurance, annuities, and pensions, from undue impairment of their standard of living."

In Section 2(d) of the Act, it is provided: "Whenever in the judgment of the Administrator such action is necessary or proper in order to effectuate the purposes of this Act, he may, by regulation or order, regulate or prohibit * * * speculative or manipulative practices or renting or leasing practices (including practices relating to recovery of the possession) in connection with any defense-area housing accommodations, which in his judgment are equivalent to or are likely to result in * * * rent increases, * * * inconsistent with the purposes of this Act."

Briefly then, by the foregoing section, the Administrator is empowered to issue regulations to effectuate the purposes of the Act, by prohibiting or regulating speculative or manipulative practices or renting or leasing practices (including practices relating to recovery of possession) in connection with any defense-rental area housing accommodations, *which in his judgment are likely to result in rent increases,* inconsistent with the purposes of the Act.

As observed in the accompanying opinion, it is true that the authority of the Administrator—*which is specifically referred to in the above section of the Act*—to regulate practices relating to the recovery of the possession, is incident to his control over improper rent increases. But his power to issue regulations with regard to rents and tenancies is not limited to such regulation as is necessary to prevent improper rent increases.

In Section 2(g)[1], the Administrator is granted broad general powers to issue regulations to prevent the circumvention or evasion of the Act. Since the purpose of the Act, as stated therein, is to eliminate and prevent manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency, and to protect persons with relatively fixed and limited incomes from undue impairment of their standard of living, which circumvent or evade the Act, the issuance of any regulations for the purpose of protecting such persons from impairment of their standard of living, or to prevent such manipulations and disruptive practices, is authorized by the Statute and is within the intended ambit of its operation.

Whether the purpose of the Act is to restrict the right of a landlord to evict a tenant from his quarters—as well as to establish maximum rents that may be exacted—may be ascertained from an examination of the following provisions of the Statute; In Section 2(b) of the Act, it is provided that the Administrator may adopt regulations fixing the rent to be charged; and in Section 2(d), above quoted, the Administrator may restrict the

---

[1] Section 2(g) provides as follows: "Regulations, orders, and requirements under this Act may contain such provisions as the Administrator deems necessary to prevent the circumvention or evasion thereof."

owner's right to terminate the tenant's occupancy, if, in his judgment, it is likely to result in rent increases. In Section 2(g) of the Act, it is provided that regulations issued under the Act shall contain such provisions as the Administrator deems necessary to prevent the circumvention or evasion thereof, and Sections 4(a) and 4(b) provide that it shall be unlawful to violate the regulation fixing rents or to remove or attempt to remove the tenant, or to refuse to renew the lease, because such tenant or occupant has taken, or proposes to take action as required by the Act or regulation or order or requirement thereunder.

From the foregoing, it would appear that one of the purposes of the Statute is to protect the tenants against being forced out of their housing accommodations, without good reason.

In Snyder v. Reshenk, 131 Conn. 252, 38 A.2d 803, 806, a well reasoned and persuasive case, the Supreme Court of Errors of Connecticut, in discussing the purposes of the Emergency Price Control Act, observed: "The context of the statute in so far as applicable to rents leaves no doubt that a primary purpose is to protect the tenant in defense rental areas, not only against the exaction of excessive rents but also against being forced, without good and sufficient reason, by the owner to move out and seek quarters elsewhere. Looking to the accomplishment of these ends, the Act provides for the adoption by the administrator of regulations fixing the rent to be charged and also restricting the owner's right to terminate the tenant's occupancy."

In the instant case, Section 6(a) of the Regulation, applicable to the tenants in this case, provides: *"Removal of tenant—(a) Restrictions on removal of tenant.* So long as the tenant continues to pay the rent to which the landlord is entitled, no tenant shall be removed from any housing accommodations, by action to evict or to recover posesssion, by exclusion from possession, or otherwise, nor shall any person attempt such removal or exclusion from possession, notwithstanding that such tenant has no lease or that his lease or other rental agreement has expired or otherwise terminated, and regardless of any contract, lease agreement or obligation heretofore or hereafter entered into which provides for entry of judgment upon the tenant's confession

for breach of the covenants thereof **or** which otherwise provides contrary hereto, unless:" (There follow certain conditions having to do with the tenant's refusal to renew the lease, refusal of access to the landlord, violation of obligation of tenancy or committing nuisance, demolition or alteration by landlord in accordance with law, and occupancy by landlord under a right to buy or a right to possession acquired prior to November 1, 1943.)

Section 6(b) (2) of the Regulation provides, among other matters, the following: *"Occupancy by purchaser.* Removal **or** eviction of a tenant of the vendor, for occupancy by a purchaser who has acquired his rights in the housing accommodations on or after November 1, 1943 is inconsistent with the purposes of the Act and this regulation and would be likely to result in the circumvention or evasion thereof, unless (i) the payment or payments of principal made by the purchaser, excluding any payments made from funds borrowed for the purpose of making such principal payments, aggregate 20% or more of the purchase price, and (ii) a period of three months has elapsed after the issuance of a certificate by the Administrator as hereinafter provided. For the purposes of this paragraph (b) (2), the payments of principal may be made by the purchaser conditionally or in escrow to the end that they shall be returned to the purchaser in the event the Administrator denies a petition for a certificate. If the Administrator finds that the required payments of principal have been made, he shall, on petition of either the vendor or purchaser, issue a certificate authorizing the vendor or purchaser to pursue his remedies for removal or eviction of the tenant in accordance with the requirements of the local law at the expiration of three months after the date of issuance of such certificate."

Section 6(b) (3) of the Regulation provides that no certificates of eviction shall be issued for occupancy by purchasers of stock in a cooperative, with certain stated exceptions [2].

What was said in the case of Snyder v. Reshenk, supra, may well be repeated with respect to the same sections of the Act and largely similar sections of the Rent Regulation, which are here in controversy: "The provisions to which we have referred, considered in connection with the context

---

[2] If a petitioner is seeking a certificate under one of these exceptions, he files, and the certificate is issued, pursuant to Section 6(b) (2).

of the Act as a whole and of the regulation, give expression to a clear intent to safeguard to the fullest possible extent the tenant's right to continuing occupancy."

The conclusion to be drawn from the statute and the sections of the Regulation, in this case, seems to follow: that the purposes of the Act as stated therein, and its various provisions, as well as the pertinent sections of the Regulation, are directed not only toward safeguarding tenants against payment of higher rents in defense-rental areas, but also to the protection of their right to continuing occupancy except for good and sufficient reasons explicitly set forth in the law.

Accordingly, in this case, the tenants have, by virtue of the Statute and the Regulation, a right to remain in possession of the apartments even beyond the term of their leases, except in certain contingencies not here relevant. In this case, they could lose possession only to bona fide purchasers who became proprietary owners of the apartments. Such purchasers are required to comply strictly with various provisions of the regulations. The tenants contend that the so-called purchasers did not, in fact and in law, become owners of the apartments; that the representations upon which such ownership is asserted are fraudulent; that the whole plan by which the original owners procured an interpretation of hardship, upon which the rights of the so-called purchasers depend, was a sham; and that the proceedings in which the order was secured by virtue of which it is sought to evict them are permeated with fraud. They claim that by virtue of the right expressly conferred upon them by the Regulation, they are entitled to possession of the apartments subject to certain well defined exceptions provided for in the Regulation. They claim that none of the exceptions have become operative; that an order based upon the supposition that they had become operative was improvidently issued; and that they are entitled, in defending their possession of the apartments, to protest such order on the ground that it was procured by fraud and misrepresentation and results in a deprivation of their rights. I am of the opinion that their contention should be sustained. A primary purpose of the Statute and the Regulation was to protect tenants in defense-rental areas against being forced by the owners to move out and seek quarters elsewhere, without good and sufficient reasons. These reasons, upon which the owner was bound to rely, in securing certificates of eviction from the Administrator, were in the nature of exceptions to the tenant's right of continuing occupancy. Where persons are granted certain specified rights by the provisions of the Emergency Price Control Act or the regulations issued thereunder, subject, however, to stated exceptions, and it is sought to deprive them of such rights by an order allegedly based upon the exceptions, such persons are entitled to file a protest to such order and contest the issue that such exceptions have become operative, as persons "subject to" the order, within the intendment of Section 203(a) of the Emergency Price Control Act, as amended.

In consideration of the foregoing, a judgment should be entered remanding the case to the Administrator with directions to hear and determine the protest on the merits.