THE HONORABLE, THE ASSEMBLY
By Assembly Resolution No. 35, you have asked whether state enabling legislation is necessary to permit cities or villages to adopt rent control ordinances. In the event the answer to that question is in the affirmative, you inquire as to the constitutionality of Assembly Substitute Amendment 1 to 1973 Assembly Bill 95.
Assembly Substitute Amendment 1 to 1973 Assembly Bill 95 would create sec. 66.84 of the statutes, which would permit certain cities to create a rent control commission with statutory authority to employ legal counsel, hold hearings, make studies and investigations, make certain orders, establish reasonable regulations for the classification of structures and make determinations of *Page 277 
maximum rents providing for "fair and reasonable return to the landlord." Noteworthy, I might add, is the fact that the bill also provides for restraints on eviction of tenants by a landlord. The violation of the rent control and anti-eviction provisions of the proposed statute, or the commission regulations or orders issued pursuant thereto, constitute criminal offenses.
I will assume at the outset that a legal framework which includes restraints on the eviction of tenants by a landlord is essential to the effective functioning of a municipal rent control program. As pointed out in Block v. Hirsh (1921),256 U.S. 135, 157-158, 41 S.Ct. 458, 65 L.Ed. 865:
". . . The preference given to the tenant in possession is an almost necessary incident of the [rent control] policy and is traditional in English law. If the tenant remained subject to the landlord's power to evict, the attempt to limit the landlord's demands would fail."
In examining this question in light of the current law, I first note the broad grant of police powers contained in sec. 62.11
(5), Stats., which provides in part that:
"Except as elsewhere in the statutes specifically provided, the council shall have . . . power to act for the government and good order of the city, for its commercial benefit, and for the health, safety, and welfare of the public, and may carry out its powers by license, regulation, suppression, borrowing of money, tax levy, appropriation, fine, imprisonment, confiscation, and other necessary or convenient means. The powers hereby conferred shall be in addition to all other grants, and shall be limited only by express language."
Further, sec. 62.04, Stats., which relates to construction of sec. 62.11 (5), Stats., requires that the section be liberally construed to promote the general welfare, peace, good order and prosperity of cities and their inhabitants. Similar provisions are set forth in reference to villages in sec. 61.34 (1) and (5), Stats.
Hence, it is well settled that a municipality acting under such a broad statutory delegation of authority may exercise that authority in the interest of the health, safety and welfare of the public, subject to the limitations that a local regulation may not directly conflict *Page 278 
with a state statute on the same subject; and, further, may not be unreasonable or arbitrary. Johnston v. Sheboygan (1966),30 Wis.2d 179, 140 N.W.2d 247; Milwaukee v. Piscuine (1963)18 Wis.2d 599, 119 N.W.2d 442; Fox v. Racine (1937), 225 Wis. 542,275 N.W. 513.
The general question of whether a municipality has the authority to enact an ordinance providing for rent control, in the absence of state enabling legislation, was considered by a predecessor of this office and, in his opinion, a governing body of any city could, pursuant to the statutory authority granted by sec. 62.11 (5), Stats., validly enact ordinances fixing rental ceilings and imposing conditions upon terminations of tenancies, in the event of an emergency affecting the health, safety and welfare of the public. 39 OAG 407 (1950). The opinion, expressly assuming the existence of emergency conditions, was given some five months after the expiration of sec. 234.26, 1949 Stats., which had provided for rent control in certain designated areas as a result of rental housing shortage conditions arising subsequent to the Second World War. Meanwhile, the Korean conflict had broken out and in the absence of a state rent control statute, the question regarding municipal authority to provide necessary rent controls was raised.
For reasons more fully detailed later in this opinion, I cannot fully concur with my predecessor's opinion that local rent control provisions providing for restraints on eviction of tenants by a landlord would not conflict with state statutes. See 39 OAG, 410. In my opinion, such local ordinances would quite clearly conflict with state law and would therefore be illegal.
The weight of authority is that specific authorization from the state is necessary to vest a municipality with power to enact a rent control ordinance. See Old Colony Gardens, Inc. v. City ofStamford (1959), 147 Conn. 60, 156 A.2d 515; Ambassador East v.City of Chicago (1948), 399 Ill. 359, 77 N.E.2d 803; City ofMiami Beach v. Fleetwood Hotel, Inc. (Fla. 1972), 261 So.2d 801;Tietjens v. City of St. Louis (1949), 359 Mo. 439, 222 S.W.2d 70; cf. Marshal House, Inc. v. Rent Review and Grievance Board ofBrookline (1970), 357 Mass. 709, 260 N.E.2d 200; contra, seeInganamort v. Borough of Fort Lee (1973), 62 N.J. 521,303 A.2d 298. *Page 279 
While these decisions have been based at least in part on a narrow reading of legislative grants to municipalities to act in the general welfare and on laws interpreted as restricting municipal powers to those specifically delegated or necessarily implied from specific delegation, some decisions denying such unauthorized local control are based on the conflict of such local rent control laws with the state laws regulating landlord and tenant relationship, particularly those state laws which relate to the eviction of tenants. Heubeck v. City of Baltimore
(1954), 205 Md. 203, 107 A.2d 99, 103. See also F.T.B.Corporation v. Goodman (Ct.App. 1949), 300 N.Y. 140,89 N.E.2d 865 and City of Miami Beach, supra. Contra, see Warren v. City ofPhiladelphia (1955), 382 Pa. 380, 115 A.2d 218 and Inganamort,supra.
In Heubeck, for instance, although the court quickly decided that Baltimore City had the power to enact rent control legislation, even in the absence of an enabling act, the court recognized the additional requirement that conditioned the exercise of this power, i.e., that such legislation not conflict with the constitution or public general law. In the latter regard, the court concluded that the local rent control ordinance under consideration was invalid because its anti-eviction provisions conflicted with state law by prohibiting an action permitted by public general law.
The question of an alleged conflict between a state statute and a municipal ordinance was before our Supreme Court in Johnston v.Sheboygan, supra, wherein the court in holding there was no direct conflict stated, at p. 184:
". . . While the statute regulates one operation of a bakery, the ordinance regulates another, and no direct conflict results. In Milwaukee v. Childs Co. (1928), 195 Wis. 148, 151,217 N.W. 703, this court stated:
"` . . . municipalities may enact ordinances in the same field and on the same subject covered by state legislation where such ordinances do not conflict with, but rather complement, the state legislation.'
"La Crosse Rendering Works v. La Crosse (1939), 231 Wis. 438,455, 285 N.W. 393; Fox v. Racine (1937), 225 Wis. 542, 545,275 N.W. 513. *Page 280 
"We recognize that the distinction that we make here is a narrow one. Nevertheless, it is a meaningful distinction, and our observing it is consistent with our responsibility to uphold the validity of an ordinance if there is any reasonable basis for so doing. Milwaukee v. Hoffmann (1965), 29 Wis. (2d) 193,138 N.W.2d 223; Odelberg v. Kenosha (1963), 20 Wis. (2d) 346, 351,122 N.W.2d 435; Milwaukee v. Piscuine (1963), 18 Wis. (2d) 599,608, 119 N.W.2d 442."
It is my opinion that no such narrow distinction as was recognized in the Johnston case would normally exist between the typical rent control ordinance containing eviction restraints and a number of current statutes regulating the landlord-tenant relationship. In my opinion, such ordinances would undoubtedly result in the prohibition of activities specifically permitted by such statutory enactments. In such instances, of course, the ordinance would clearly conflict with state law and would be invalid. See Fox case, supra.
For instance, let us assume that an ordinance enacted without state enabling legislation contained a provision, such as set forth in sec. 66.84 (6) (a) of the proposed bill, which prohibited eviction of a tenant from any housing accommodation with respect to which a maximum rent is in effect, unless certain specific grounds therein set forth were satisfied. It would be appropriate to compare such a provision with ch. 704 and certain sections of ch. 299, Stats., which also regulate and affect landlord and tenant rights. Section 704.23, Stats., applicable statewide, provides that where a tenant remains in possession without consent after termination of his tenancy, the landlord may "in every case" proceed "in any manner permitted by law" to remove him and collect damages. Section 704.05, Stats., similarly "governs the rights and duties of the landlord and tenant" by providing that with certain exceptions the tenant has exclusive possession of the premises "[u]ntil the expiration date specified in the lease, or the termination of a periodic tenancy or tenancy at will." I note also apparent direct conflicts with sec. 704.19, Stats. (termination of periodic tenancy or tenancy at will by notice) and sec. 704.27, Stats., (tenant in possession without consent liable for "double rent"). Hence, assuming a municipality adopted an ordinance containing restraints on eviction similar to those in the *Page 281 
proposed bill, it is clear that there would be an impermissible direct conflict with existing state statutes.
Assuming, therefore, that state enabling legislation is necessary to avoid conflict with state statute, I will consider the constitutionality of the proposed bill.
Because significant limitations on the right of citizens to utilize and freely contract with reference to their property appears to be an inherent part of most rent control laws, they have been subject to examination under both federal and state constitutional provisions which prohibit laws which impair the obligation of contracts, deprive persons of their life, liberty or property without due process of law or take private property for public use without just compensation. Article I, sec. 10,Fifth and Fourteenth Amendments, U.S. Const.; Art. I, secs. 1, 12
and 13, Wis. Const.
In this regard, it is apparent from the case law that the initial and probably the only acceptable justification for broad rent control legislation has been a bona fide emergency. Assuming the existence of such a declared emergency, it has been held that Congress could meet it by a rent control statute which extended the right of a tenant to occupy rented property used as his residence beyond the expiration of his term, at his option, subject to regulation by a commission appointed by the act, so long as he paid the rent and performed the conditions as fixed by his lease, or as modified by the commission. Block v. Hirsh
(1921), 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165. See also City of Miami Beach, supra, at p. 804, and 50 Am.Jur. 2d, Landlord and Tenant, § 1248, et seq.
On the other hand, such declaration must be supported by fact. In Warren v. Philadelphia (1956), 387 Pa. 362, 127 A.2d 703, for instance, the municipal ordinance providing for an extension of post-war rent controls had been reenacted pursuant to a legislative finding by the governing body that an emergency housing shortage still existed in that city; however, evidence adduced in court showed that the overall vacancy rate had increased nearly threefold over prior months to what was considered a normal level for that municipality. The court, therefore concluded, that the evidence clearly established that no emergency housing shortage existed in Philadelphia which could justify the rent control ordinance before *Page 282 
it. See also Kress, Dunlap and Lane Ltd. v. Downing, 193 F. Supp. 874
(D.C.V.I. 1961).
Whether an express finding is necessary to sustain the validity of rent control laws enacted in Wisconsin is a question that can only be answered satisfactorily by the Wisconsin courts. However, it should be sufficient for the present for me to point out that all previous rent control statutes enacted in Wisconsin were
predicated on the declaration of the existence of an emergency shortage of housing accommodations. I further note that the court in Central Sav. Bank v. Logan (1945), 184 Misc. 203,54 NYS 2d 31, clearly states that "the legislature may interfere with contractual arrangements between landlord and tenant only because of the declaration of emergency, . . ." As an ancillary condition to the requirement that there be an emergency, such legislation must be temporary in nature. As stated in Block, supra, at256 U.S. 157:
". . . The regulation is put and justified only as a temporary measure. [citations] A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change."
I note that it has also been stated as a general proposition that municipal rent control enactments have been sustained as a temporary expedient only to meet housing emergencies. 6 McQuillin, Municipal Corporations (3rd ed.), § 24.19, 7 McQuillin, Municipal Corporations (3rd ed.), § 24.563d.
The legislation here considered does not contain any declaration of emergency. It does not purport to be temporary in nature. Nor does it suggest that any such finding or determination must be made by a city creating a rent control commission under its provisions. In my opinion, the absence of some declaration and characterization of the nature of the emergency which is thought to justify such legislation, together with the absence of such time limitation, would leave the courts without sufficient basis to sustain such an enactment as a constitutional exercise of the police power.
The lack of any declaration of legislative purpose and the absence of any legislative declaration of a temporary housing emergency, or requirement for such, in the instant proposed legislation makes it an incomplete bill and also makes it difficult to accurately determine *Page 283 
whether the various provisions of the bill bear a real and substantial relation to the objects sought to be attained. I note, for instance, that sec. 66.84 (2) of Substitute Amendment 1 to 1973 Assembly Bill 95 states: "Any city having a population of 150,000 or more may by ordinance establish a rent control commission as provided in this section."
The fact that a rent control law only applies to a limited number of governmental entities does not necessarily lead to the conclusion that such law violates the constitutional guarantee of equal protection of the law under the state and federal constitutions, Wagner v. Newark (1956), 42 NJS 193, 126 A.2d 71;Marcus Brown Holding Co. v. Feldman (1921), 256 U.S. 170,41 S.Ct. 465, 65 L.Ed. 877. See also Bittenhaus v. Johnston (1896),92 Wis. 588, 66 N.W. 805; State ex rel. Lund v. Seramuc [Seramur]
(1955), 269 Wis. 1, 68 N.W.2d 570. However, in the absence of some legislative history or declaration to support such a classification, the legislation raises the question of denial of equal protection of the law to those rental property owners affected in cities having a population of more than 150,000 as well as to tenants in rental property located in heavily urbanized areas outside such cities. Although some differentiation may be justified in the case of temporary emergency legislation of the kind under consideration, something more is necessary than is present in the proposed bill to identify the uniqueness of such cities. For instance, it should be demonstrable that the emergency which gives rise to the need for such legislation is sufficiently peculiar to cities of the population identified so as to justify such a classification. This may prove difficult to demonstrate, if there are sizeable population concentrations within the state which equal or exceed that figure, yet not fall conveniently within the boundaries of any one city, village, town, or where the evils sought to be remedied by such legislation can be shown to exist to the same or greater extent in the greater metropolitan area of which such larger cities are but a part.
In State ex rel. Milwaukee S. I. Co. v. Railroad Commissionof Wisconsin (1921), 174 Wis. 458, 183 N.W. 687, our Supreme Court was presented with a challenge to the validity of ch. 16, Laws of 1920 Special Session, which was enacted to provide for rent control following World War I. That legislation applied to counties having a population of 250,000 and over and, in effect, was *Page 284 
applicable only to Milwaukee County. The Supreme Court, although recognizing that the legislature may make classifications of persons, occupations, or industries and select them for special regulation if there are reasonable and proper economic, political, or social reasons for doing so, pointed out at page 464:
"While this right to classify must be fully recognized it must nevertheless always be borne in mind that the equal protection of the laws is guaranteed, and that if any classification made in a statute seeking to regulate property and contract rights denies to one class rights and privileges which are granted to another under the same conditions and circumstances, it offends against the principle of equal protection of the law. . . ."
The court, in holding the enactment invalid, went on to say at page 465:
". . . The evils resulting therefrom, and which this legislation seeks to remedy, were incident to the conditions wherever they existed and were equally pernicious in their effects upon tenants everywhere. It is urged, however, that the legislative judgment in applying the law only to the class of landlords operating the business in thickly settled communities necessarily implies that the resultant evils were found to be a greater menace to the public welfare, health, and morals in such communities than in the sparsely settled districts of the state. But can it reasonably be said that such is the fact? Do the evils enumerated in the act in fact affect the public differently in counties having 250,000 population and over than in those having a lesser population? It is a matter of common knowledge that the oppressive exactions denounced by the act are as objectionable in their effects upon the public in the smaller cities of the state as in the larger ones and that the evil produced no different conditions in the county of Milwaukee than in other counties of the state. True, a larger number of persons were affected in Milwaukee county than in any other county, but this in no way caused a different economic, social, or political condition in this county than in any other county of the state where the evil existed. We find nothing in the conditions and characteristics affecting persons and property of landlords and tenants embraced in this act that distinguishes those in one county from those of any other county of the state in any respects germane to the purposes of this act." *Page 285 
In my opinion, the classification based on a population level of 150,000 appears to suffer from a defect similar to that pointed out by our Supreme Court in 1921, at least under the present form of the proposed enactment.
It should be noted in passing that the post-World War II Wisconsin rent control legislation largely avoided the classification question. The provisions of the then sec. 234.26, Wis. Stats., enacted by ch. 442, Laws of 1947, and amended by ch. 614, Laws of 1947, were applicable only to housing accommodations regulated by the then federal rent control statute, "House and Rent Act of 1947," 50 U.S.C.A. App., sec. 1881, et seq. The subsequent repeal and recreation of sec. 234.26 by the Laws of 1949, chs. 33, 597, 598 and 643, provided for similar applicability and was a direct response to the provisions of the federal "Housing and Rent Act of 1949," extending rent control. Since the federal statute permitted rent decontrol in local areas where it was determined a housing shortage no longer existed, a classification challenge was not likely to arise under the ancillary Wisconsin Statute. The constitutionality of the federal rent control statute was upheld in Woods v. Cloyd W. Miller Co. (1948), 333 U.S. 138, 145, 68 S.Ct. 421, 92 L.Ed. 596, wherein the Supreme Court held there was no denial of equal protection. Similarly the validity of sec. 234.26, 1947 Stats., was upheld inMeier v. Smith (1948), 254 Wis. 70, 35 N.W.2d 452, where an alleged conflict between the eviction notice provisions of the federal and state statutes was before the court.
As noted previously, the violation of certain of the regulations and orders made by the rent control commission established under the authority of the proposed bill would constitute crimes. Under the rule set forth in State ex rel.Keefe v. Schmeige (1947), 251 Wis. 79, 28 N.W.2d 345, power may not be granted to local government to create crime since crime is an offense against the sovereign. However, Keefe does not apply where the determination has been made by the legislature that there should be a law, and has determined the general policy to be accomplished and that regulations or orders properly promulgated within the fixed limits of its authority should be enforceable by criminal sanctions. Olson v. State ConservationComm. (1940), 235 Wis. 473, 293 N.W. 262. In general, the statutory guidelines set forth in the proposed bill appear sufficient for the enactment of such regulations and orders *Page 286 
by the proposed rent control commissions. However, the proposed bill also authorizes the governing body of the city to implement the statutory plan. This authority is set forth in sec. 66.84 (14), which provides:
"(14) APPLICABILITY. Any city enacting an ordinance pursuant to this section may make such ordinance applicable to any or all housing accommodations permitted by this section, and may also make the ordinance applicable only to accommodations constructed after the effective date of the ordinance."
In my opinion, the delegated discretion to such cities to determine what housing accommodations would or would not be regulated would constitute an unauthorized legislative delegation of the power to create crime, since the cities rather than the state would effectively determine which housing accommodations would be subject to rent and eviction control and therefore which landlords would be subject to possible criminal sanctions. SeeState ex rel. keefe v. Schmiege and Olson v. State ConservationComm., supra.
In addition, that portion of subsection (14) which would allow cities to restrict the application of local rent control ordinances to housing accommodations constructed after the effective date of the local ordinance would authorize the establishment of an unreasonable classification and would therefore constitute a denial of equal protection of the law to those engaged in new construction of rental property. All classifications must be based upon substantial distinctions which make one class really different from another and must be germane to the purpose sought to be accomplished. State ex rel. FordHopkins Co. v. Mayor (1937), 226 Wis. 215, 222, 276 N.W. 311;Cayo v. Milwaukee (1969), 41 Wis.2d 643, 649-650, 165 N.W.2d 198. If the justification for rent control is that a critical shortage of housing exists, provisions such as this one, which tend to discourage the construction of new rental housing while at the same time leaving existing rental housing uncontrolled, would appear to lack any reasonable relationship to the purpose to be accomplished by rent control laws in general.
The subject bill also proposes, in sec. 66.84 (6) (b), to authorize a local rent control commission to issue a "certificate of eviction," permitting a landlord to pursue his remedies at law, when certain conditions are met. Subparagraph (b) 4 provides that when such a *Page 287 
certificate is issued for the purpose of allowing the landlord to demolish old and construct new housing, the commission may also require the landlord to "pay stipends to the tenants in such amounts as the commission may determine to be reasonably necessary, which amounts may vary depending upon the size of the tenant's apartment and whether the tenant accepts relocation by the landlord." While under emergency conditions the courts have upheld the right of government to limit the right of the landlord to demolish his rental property unless he has assisted his tenants in obtaining other suitable housing at no greater rent,Loab Estates v. Druhe (1949), 30 NY 176, 90 N.E.2d 25, I find this statutory provision ambiguous, lacking in standards and easily susceptible to arbitrary implementation. I also note that it is unclear how the provisions of see. 66.84 (6) (b) 4 would relate to the demolition of buildings or structures for purposes other than replacement rental housing. In my opinion, therefore, this provision would quite possibly be held to constitute an unconstitutional interference with private property rights.
I have pointed out a number of specific instances in which I feel Assembly Substitute Amendment 1 to 1973 Assembly Bill 95 is constitutionally infirm. However, as indicated previously, I consider the bill incomplete without some provision for a declaration of legislative necessity and some recognition of the temporary nature of such enactments. The existence and the nature of any such declaration would have a direct effect on whether its provisions would be found to be constitutional.
RWW:JCM